# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Interlake Material Handling, Inc., *et al.*,[1] | ) | Case No. 09-10019 (KJC) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |

## DECLARATION OF JACQUELINE M. BARRY
## IN SUPPORT OF FIRST DAY PLEADINGS

I, Jacqueline M. Barry, hereby certify, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Chief Financial Officer ("CFO") of each of Interlake Material Handling, Inc. ("Interlake"), United Fixtures Company, Inc. ("United Fixtures"), UFC Interlake Holding Co. ("UFI Holding"), and Conco-Tellus, Inc. ("Conco-Tellus" and, with Interlake, United Fixtures, and Interlake Holding, each a "Debtor" and together, the "Debtors").

2.      Each of the Debtors is a corporation organized and existing under the laws of the State of Delaware. My current duties for the Debtors include overseeing the Debtors' overall financial condition, monitoring the Debtors' receipts and disbursements of cash, maintaining the Debtors' books and records, preparing financial projections (in consultation with the Debtors' senior management team), and communicating with, among other parties, the Debtors' professionals, the Debtors' senior secured lenders (including National City Business Credit, Inc. ("NCBC") and the Debtors' senior subordinated lender, Roynat Business Capital, Inc. ("Roynat" or, the "Junior Secured Lender"). I am authorized by the Debtors to submit this Declaration on their behalf and have personal knowledge of the facts set forth herein.

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Interlake Material Handling, Inc. (9435); United Fixtures Company, Inc. (2048); UFC Interlake Holding Co. (9905), and Conco-Tellus, Inc. (9950).  The address for all of the Debtors is 1230 E. Diehl Road, Suite 400, Naperville, Illinois 60563, except for United Fixtures Company, Inc., whose address is 4300 Quality Drive, South Bend, Indiana 46628.

3.     As CFO of each of the Debtors, I am familiar with the Debtors' books and records, results of operations, and the ability of the Debtors to maintain their operations under various liquidity scenarios.  As a result of that familiarity and my first-hand experience, I have formed opinions regarding the necessity for the relief sought in the Debtors' first-day motions and applications, especially to the extent that such relief will enable the Debtors to continue to operate as they pursue a going-concern sale or other sales of substantially all of their assets.

4.     I therefore submit this Declaration in support of the first-day motions and applications described below, as well as other motions and applications of the Debtors in the above-captioned chapter 11 cases.  Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge, my review of relevant records and documents, information from the Debtors' employees or advisors, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

5.     Based on my personal knowledge and the review discussed above, I believe that the relief sought by the Debtors in the first-day motions and applications is necessary to enable their chapter 11 bankruptcy estates to be administered effectively.  Failure to grant such relief would have a serious, negative effect on the Debtors' efforts to continue operating during their chapter 11 cases and pursue and consummate a going-concern sale or other sales of substantially all of their assets.  Part I of this Declaration describes the business of the Debtors, their debt structure, and key events leading to the filing of the Debtors' chapter 11 petitions. Part II of this Declaration sets forth relevant facts in support of the various first-day motions and applications filed by the Debtors concurrently with this Declaration.

DB02:7696577.2

067999.1001

## I.    BACKGROUND

### *The Acquisition of Interlake and United Fixtures and the Formation of UFI Holding*

6.    The Debtors' ultimate equity sponsor acquired United Fixtures in June of 2005 and Interlake in April of 2006.    Subsequent to the acquisition of Interlake, UFI Holding was formed and a tax-free reorganization occurred whereby United Fixtures and Interlake became wholly-owned subsidiaries of UFI Holding.    Debtor Conco-Tellus is a non-operating wholly-owned subsidiary of Interlake, whose sole purpose is to hold minority equity interests in certain Mexican subsidiaries.

### *The Debtors' Capital Structure*

#### The Prepetition Senior Secured Facility

7.    As of the commencement of the Debtors' chapter 11 cases (the "Petition Date"), United Fixtures Company and Interlake, as borrowers, were parties to that certain First Amended and Restated Credit and Security Agreement (as amended, restated, and in effect from time to time, the "Prepetition Senior Secured Credit Agreement") with NCBC as administrative agent, and collateral agent for the lenders from time to time party thereto and National City Bank ("NCB") as issuer (in such capacity, the "Prepetition Senior Agent"), NCBC as a lender (together with any other lenders, the "Prepetition Senior Secured Lenders" and, collectively with the Prepetition Senior Agent, the "Prepetition Senior Secured Parties"). The Prepetition Senior Secured Credit Agreement provides for:  (i) a revolving credit facility (and letter of credit subfacility) (the "Revolving Credit Facility") in the maximum aggregate amount of $48 million; (ii) a term loan (the "Term Loan") in the amount of $15 million; and (iii) equipment loans in the maximum aggregate amount of $3 million (the "Equipment Loans" and, collectively, with the Revolving Loan and the Term Loan, the "Prepetition Senior Secured Credit Facility").

DB02:7696577.2

067999.1001

8.     UFI Holding and Conco-Tellus and certain of the Debtors' non-debtor affiliates guaranteed the obligations incurred by the borrowers under the terms of the Prepetition Senior Secured Credit Facility.

9.     The amounts borrowed under the Prepetition Senior Secured Credit Facility were used to fund, among other things, working capital requirements. As of the Petition Date, approximately $36 million was outstanding under the Prepetition Senior Secured Credit Agreement.

10.     Pursuant to the Prepetition Senior Secured Credit Agreement, the Debtors assigned, pledged and granted to the Prepetition Senior Secured Parties a continuing security interest in and to, and first-priority lien on, the Debtors' then-owned or thereafter-acquired right, title and interest in and to, substantially all of the Debtors' real and personal property and the proceeds thereof.

The RoyNat Facility

11.     As of the Petition Date, United Fixtures and Interlake, as borrowers, were also parties to that certain Credit and Security Agreement, dated as of April 21, 2008 (the "Prepetition Junior Secured Credit Agreement"), with Roynat, as agent (in such capacity, the "Prepetition Junior Agent") and a lender (in such capacity, with the other lenders party to the Prepetition Junior Secured Credit Agreement, the "Prepetition Junior Secured Lenders" and, collectively, with the Prepetition Junior Agent, the "Prepetition Junior Secured Parties"). The Prepetition Junior Secured Credit Agreement provides for a term loan (the "Prepetition Junior Term Loan") in the amount of $10,500,000 (the "Prepetition Junior Secured Credit Facility" and, with the Prepetition Senior Secured Credit Facility, the "Prepetition Secured Credit Facilities"). UFI Holding and Conco-Tellus, together with certain of the Debtors non-debtor

4

affiliates, guaranteed the obligations incurred by the borrowers under the terms of the Prepetition Junior Secured Credit Agreement.

12.     The amounts borrowed under the Prepetition Junior Secured Credit Agreement were used to fund, among other things, the Debtors' working capital requirements. As of the Petition Date, approximately $11.6 million was outstanding under the Prepetition Junior Secured Credit Agreement.

13.     Pursuant to the Prepetition Junior Secured Credit Agreement, the Debtors assigned, pledged and granted to the Prepetition Junior Secured Parties a continuing security interest in and to, and second-priority lien on, the Debtors' then-owned or thereafter-acquired right, title and interest in and to, substantially all of the Debtors' real and personal property and the proceeds thereof.

14.     In addition to the outstanding obligations under Prepetition Secured Credit Facilities, the Debtors estimate that they have unsecured trade debt in the aggregate amount of approximately $30.1 million, not including rejection damage claims that may be asserted by contract counterparties. The Debtors believe that the bulk of the trade debt claims are at the Interlake and United Fixtures levels. Additionally, the Debtors have intercompany, unsecured claims among each other.

*The Debtors' Corporate Structure*

15.     UFI Holdings is a holding company for its two wholly-owned subsidiaries, United Fixtures and Interlake. Conco-Tellus, Inc. is a wholly-owned subsidiary of Interlake.

16.     United Fixtures owns 50% of the equity in non-debtor NSF Mexicali S. de R.L. de C.V and is the parent company for non-debtors NSF Colombia, S. de R.L. de C.V. and J&D Company, LLC. In addition to being the parent company of Conco-Tellus, Inc., Interlake owns 50% of the equity interests of non-debtor NSF Mexicali S. de R.L. de C.V. and is the majority

owner of the following non-Debtor entities: (i) Interlake de Mexico, S.A. de C.V., (ii) Industrias Interlake S.A. de C.V., and (iii) Empresas Interlake de Matamoros, S.A. de C.V. Conco-Tellus, Inc. owns a minority interest in each of these three entities (together with the other non-debtor affiliates identified in this paragraph, the "Non-Debtor Affiliates"). As indicated above, the Non-Debtor Affiliates are not debtors in these chapter 11 cases.

***The Debtors' Historical Operations and Recent Developments***

17. United Fixtures is a leading designer and manufacturer of heavy-duty steel storage and display racks to targeted markets throughout the United States, Canada and Mexico. Its customers are primarily retail home centers and other specialty retailers.

18. Interlake is the largest manufacturer and supplier of heavy-duty steel storage rack in North America. Its customers are retailers, mass merchants, distributors, archive storage providers, healthcare products distributors, and third party logistics providers.

19. Operating together under the UFI Holdings umbrella, the Debtors and their Non-Debtor Affiliates (collectively, the "Consolidated Entities") are a leading independent, single-source supplier of heavy-duty storage and other fulfillment systems serving many of the most desirable customers in the most attractive retail and industrial markets throughout North America. Although the corporate and financial structure of the Consolidated Entities was created only in the past several years, the Debtors and their predecessors have manufactured heavy-duty steel and other storage racks for over 70 years.

20. The Debtors' leading manufacturing techniques have garnered a reputation for quality products throughout the industry. Operating through the brand names Interlake, National Store Fixtures, Interlock, Retail Service Solutions and J&D Associates, the Debtors and their non Debtor affiliates have long-standing relationships with some of the largest retail companies in the United States.

DB02:7696577.2

067999.1001

21.     As of the Petition Date, the Debtors employed in excess of 500 employees at twelve manufacturing and other locations across the country. Employees in the Debtors' Pontiac, Illinois and Niles, Michigan manufacturing facilities work pursuant to collective bargaining agreements. The Debtors' corporate headquarters is located in Naperville, Illinois.

22.     During the fiscal year ended June 29, 2008, the Consolidated Entities reported net sales of approximately $302 million dollars and net income of approximately $3.2 million.

23.     Shortly before the Petition Date, United Fixtures contributed certain of its assets and liabilities to a newly-formed, wholly-owned subsidiary, J&D Company LLC ("J&D"). J&D holds the assets related to the Debtors' Retail Services Solutions and J&D divisions. the Debtors believe that the value of these assets will be maximized by keeping them out of bankruptcy while the assets are marketed. The Debtors believe this will enhance the value of the J&D assets without causing any harm to the Debtors' estates.

***The Decision To Seek Bankruptcy Protection***

24.     Since the end of the fiscal year ended June 29, 2008, the Debtors have incurred substantial operating losses, negative cash flow, and negative EBITDA. As a consequence of the decline in activity in the residential and commercial construction industry and the decline in economic growth across most sectors of the U.S economy, the Debtors have experienced a reduction in business across all market segments. In addition to the decline in customer orders, increases in commodity prices, particularly steel, had a significant negative impact on the Debtors' profitability during much of 2008. A subsequent decrease in steel prices (and a corresponding decrease in the value of the Debtors' inventory) led to a tightening of the Debtors' availability under the Debtors' Prepetition Senior Secured Credit Facility. Combined, these and other events led to the Debtors experiencing operating losses that could not be

sustained over an extended period of time without creating liquidity constraints that ultimately would prevent the Debtors from continuing to operate.

25.     The Debtors formulated a plan to consolidate their operations and return to profitability without the need to commence these chapter 11 cases, but they were unable to obtain the capital necessary to implement that plan. The Debtors therefore determined that one or more going-concern and/or other sales of (in the aggregate) substantially all of their assets would maximize the recovery to their creditors.

26.     Prior to the Petition Date, the Debtors' contacted certain potential purchasers in an attempt to market their assets. This process resulted in the execution of that certain Acquisition Agreement dated December 31, 2008 (the "Acquisition Agreement") between the Debtors, as sellers, and Mecalux USA, Inc. and Mecalux Mexico S.A. de C.V. (together, "Mecalux" or the "Potential Buyer"), as buyers. The Acquisition Agreement contemplates the sale of substantially all of the Debtors' assets for a purchase price of $30,000,000, subject to certain adjustments.

27.     The Debtors commenced these chapter 11 cases in order to implement a competitive sales process and effectuate a sale of the Debtors' assets, either to Mecalux under the Acquisition Agreement or to a higher and better bidder that results from a chapter 11 sale process. The Debtors retained Huron Consulting as their financial advisor to assist them during these chapter 11 cases and in connection with the sale process.

28.     The Senior Lenders have confirmed their support for the Debtors and have consented to the potential sale of the Debtors' assets to Mecalux under the Acquisition Agreement. The Prepetition Senior Secured Lenders have agreed to provide loans (the "DIP Loans") to finance the Debtors' chapter 11 cases through and for a limited time after the

DB02:7696577.2                                                                                    067999.1001

conclusion of the sale process. The DIP Loans will enable the Debtors to: (a) continue their operations pending the marketing of the Acquisition Agreement to determine whether higher or otherwise better bids exist, and (b) after the sale process concludes, consider strategies for disposition of their remaining assets and the continuation or conclusion of their chapter 11 cases.

29.     The unfortunate circumstances that have led to the filing of these cases have impacted each of the Debtors' stakeholders. The Debtors intend to operate their business pending the sale or other disposition of their assets, and distribute the proceeds thereof, in this proceeding. The Debtors expect to sell substantially all of their assets either pursuant to the Acquisition Agreement or pursuant to a higher or otherwise better bid.

## II.     FACTS IN SUPPORT OF FIRST DAY PLEADINGS

30.     The Debtors have respectfully requested that the pleadings described below (the "First Day Pleadings") be granted as critical elements in successfully administering their bankruptcy estates. I offer the following factual background in support of the First Day Pleadings:

### A.     Joint Administration Motion

31.     The Debtors have respectfully requested that the Court enter an order directing the joint administration of their chapter 11 cases, for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

32.     The joint administration of the Debtors' chapter 11 cases will permit the Clerk of the Court to use a single general docket for each of the Debtors' cases and allow all parties to these cases to combine notices to creditors and other parties in interest of the Debtors'

DB02:7696577.2                                                                                          067999.1001

respective estates. The Debtors anticipate that numerous notices, applications, motions, and other pleadings, hearings, and orders in these cases will affect all of the Debtors.

33.     Joint administration will save time and money and avoid duplicative and potentially confusing filings by permitting parties in interest to: (a) use a single caption on all documents that will be served and filed in the Debtors' chapter 11 cases; and (b) file pleadings in one case rather than in multiple cases. Joint administration will also protect parties in interest by ensuring that parties in each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in these cases and ease the administrative burden for the Court and all parties in interest.

34.     The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases, because the relief the Debtors seek is purely procedural and is in no way intended to effect substantive rights. Each creditor and other party in interest will maintain whatever rights it has against the particular estate in which it allegedly has a claim or interest.

**B.      Employee Wages and Benefits Motion**

35.     As of the Petition Date, the Debtors employed approximately 500 full-time and part-time hourly-wage and salaried Employees[2] and utilized the services of approximately fifteen third-party contractors. Approximately 200 of the Employees are union Employees subject to: (a) the labor agreement between United Fixtures Company and Local Union #7, Affiliated with the International Brotherhood of Teamsters, Kalamazoo, Michigan (the "Niles Labor Agreement"); or (b) the labor agreement between Interlake Material Handling, Inc. (Pontiac Plant) and the International Union, United Automobile, Aerospace and Agricultural

---

[2]     Each capitalized term used but not defined herein shall have the meaning ascribed thereto in the First Day Pleading it is then being used to describe.

Implement Workers of America, UAW, and its Affiliated Local Union 2488 (the "Pontiac Labor Agreement", and, with the Niles Labor Agreement, each a "Labor Agreement" and together, the "Labor Agreements"). The Debtors seek authority to pay Employees' accrued prepetition wages and other benefits in amounts up to the amounts that would otherwise be allowed as priority claims in the Debtors' chapter 11 cases, to continue certain benefits programs, and to allow Employees to use accrued vacation and personal time, generally in accordance with the Debtors' prepetition policies. The Debtors seek this relief because the continued and uninterrupted service of the Employees is essential to maximize the value of the Debtors' estates for the benefit of their creditors, especially in light of the proposed sale of the Debtors' assets.

36.     To minimize Employees' personal hardships and to enhance the Debtors' ability to retain Employees in this uncertain time, the Debtors seek authority to pay certain prepetition claims arising on account of the Employees for, among other items, wages, salaries, expense reimbursement, federal and state withholding taxes, payroll taxes, health claims, and many other employee benefits which the Debtors pay in the ordinary course of business (collectively, the "Employee Obligations"), including the Unpaid Compensation, the Employee Deductions, the Employee Benefits, the Health Benefits, the Employee Insurance Benefits, and the Other Benefits (collectively, with the Employee Obligations, the "Employee Payments").

37.     The Debtors request authority: (a) to pay to Employees, in their discretion, outstanding wages and salaries owed; (b) to allow Employees to use accrued vacation time, accrued floating holiday hours, and to maintain paid leave policies; (c) to maintain current medical benefit policies and certain insurance plans and programs, including payment for outstanding medical expenses and related expenses; (d) to pay withheld and unremitted 401(k)

DB02:7696577.2

067999.1001

and other funds; (e) to pay reimbursable employee expenses; and (f) to maintain certain benefit programs in the ordinary course of the Debtors' business.

38. <u>Unpaid Compensation</u>. In the ordinary course of business, the Debtors: (a) issue payroll checks to their salaried and hourly Employees, and (b) pay contract labor pursuant to invoices received and paid in the ordinary course of business. The Debtors pay their Employees employed under the Labor Agreements each Friday, one week in arrears. Debtor Interlake issues payment to its non-union, salaried Employees on the fifteenth and last day of each calendar month. United Fixtures issues payment to its non-union, hourly Employees each Friday, one week in arrears, in a manner similar to the manner in which Employees are paid under the Labor Agreements. United Fixtures salaried employees are paid either: (i) every other Friday for work performed in the two-week period ending on that Friday or (ii) weekly, one week in arrears.[3] Certain of the Employees are salespeople who receive commission in addition to their regular salary or wage.

39. Approximately $800,000 in wages, salaries, commissions, overtime pay, jury pay, vacation leave taken, sick leave taken, and other compensation (excluding accrued vacation and severance pay) has accrued prior to the Petition Date and remains unpaid (exclusive of year-end and other bonuses, collectively, the "<u>Unpaid Compensation</u>").

40. <u>Paid Vacation and Floating Holidays</u>. The Debtors offer different vacation benefits to their Employees. Generally, each fiscal year, Employees are entitled to various numbers of days of paid vacation per year depending on the total number of years the Employee has worked for the Debtors.

---

[3]     If any pay day falls on a Saturday, Sunday, or holiday, the Debtors generally issue payroll to their Employees on the prior business day.

41. Union Employees employed under the Labor Agreements[4] are eligible to take from one to four weeks of paid vacation each year, based on, among other things, the length of their employment with the Debtors. Under the Pontiac Labor Agreement, union Employees are paid in cash the value of their accrued and unused vacation days at the end of each calendar year. Under the Niles Labor Agreement, each year union Employees may elect in writing to be paid in cash the value of up to one week of paid vacation not taken.

42. Non-union Employees are eligible for up to four weeks of paid vacation each fiscal year. Unless state or other applicable law provides otherwise, unused non-union vacation days are forfeited at the end of each fiscal year and such Employees cannot receive a cash payment for the value of such paid vacation time not taken.

43. As of the Petition Date, most of the Employees have accrued unused vacation days. The total value of such accrued vacation as of the Petition Date is approximately $1,470,000.

44. Under the Niles Labor Agreement, eligible union Employees may take one paid floating holiday each year. Certain non-union Employees are eligible to take up to three floating holidays each year, if such floating holidays are not assigned by the Debtors as floating holidays to be taken on specific days by all eligible Employees. Paid floating holidays of non-union Employees may not be carried over or accrued from year to year and may not be "cashed out" if not taken. The aggregate amount of the Debtors' floating holiday obligations to Employees is included in the amount of accrued wages, indicated above.

---

[4] The description of the Debtors' employment practices and policies herein are for information only and are subject in their entirety to the terms and conditions of the Labor Agreement and the Debtors' written and otherwise established labor and employment policies and guidelines. In the event of any inconsistency between (a) the Labor Agreements and such labor and employment policies and guidelines and (b) this Declaration, the Labor Agreements and the Debtors' prepetition policies and guidelines shall control.

45.     401(k) Plans.  The Debtors offer certain union and salaried Employees the opportunity to participate in the United Fixtures Interlake Retirement Savings Plan, a retirement plan qualified under section 401(k) of the Internal Revenue Code (the "UFI 401(k) Plan").  Under the terms of the UFI 401(k) Plan, certain Employees can elect to contribute a portion of their salary or wages to the UFI 401(k) Plan and the Debtors, under certain circumstances, may elect to match or otherwise contribute to the UFI 401(k) Plan for the benefit of the Employee participants in the Plan (in addition to the contributions otherwise made by the Employees).  Prior to the Petition Date and in accordance with the agreements governing the UFI 401(k) Plan, the Debtors ceased making any contributions to the UFI 401(k) Plan, other than contributions of a portion of Employees' wages and salaries, as directed by individual Employees.  The Debtors do not anticipate matching Employee contributions or otherwise contributing to the UFI 401(k) Plan, other than remitting to the UFI 401(k) Plan amounts deducted from Employee's wages and salaries, as directed by individual Employees.

46.     The Debtors have established various plans and policies to provide their Employees with medical, dental, vision, disability and life insurance, and other similar benefits (collectively the "Employee Benefits").

47.     Certain Employees have elected to receive or are otherwise entitled to group health (including prescription care), dental care, and vision insurance (collectively, the "Health Benefits").

48.     The cost of the Health Benefits is shared by the Debtors and the Employees.  Employees generally contribute between 23 – 30% of the cost of premiums related to the Health Benefits (depending on the benefits and coverage elected) and the Debtors pay the remaining premium costs.  Historically, the Debtors have paid approximately $600,000 each

14

month in amounts related to Health Benefits. These costs, however, are likely higher than the costs that the Debtors will incur after the Petition Date, because the Debtors reduced the size of their workforce during calendar year 2008.

49.     The Debtors maintain a self-funded Employee health plan administered by Blue Cross/ Blue Shield of Illinois ("Blue Cross"). Prior to the Petition Date, each month the Debtors typically paid approximately: (a) $520,000 on account of employee claims that arose under their self-funded health care plan, and (b) $32,000 on account of Blue Cross Administration Fees. The Debtors' self-funded health care plan limits their obligations to approximately $150,000 per Employee participant. The Debtors' health plans provide Employees access to health care, hospital care, and prescription drug coverage, among other benefits.

50.     Under the Debtors' health plan, Employees can elect a consumer driven plan option (the "Consumer Driven Plan") that allows the covered Employee making such election to greatly reduce his or her monthly health care contribution. Employees choosing the Consumer Driven Plan, however, pay significantly higher deductibles than Employees not electing the Consumer Driven Plan. To help defray these costs, the Debtors provide Employees electing the Consumer Driven Plan access to a healthcare reimbursement account program administered by FlexBenefits Corporation ("FlexBenefits"). When Employees who have elected the consumer driven health plan option submit a claim, the Debtors may reimburse the Employee for a portion of their deductible in accordance with the terms of the Flexbenefits healthcare reimbursement program. Prior to the Petition Date, each month the Debtors typically paid approximately: (a) $4,400 to reimburse Employees for deductible payments under the FlexBenefits healthcare reimbursement program, and (b) $546 to FlexBenefits for

15

related administration fees. The Consumer Driven Plan is the Employee health care plan with the lowest cost the Debtors and the Debtors believe that the health care savings they enjoy when Employees elect the Consumer Driven Plan more than offset the Debtors' costs under the FlexBenefits healthcare reimbursement program.

51.     The Debtors also maintain a self-funded Employee dental plan administered by Metropolitan Life Insurance Company ("Metlife"). Prior to the Petition Date, each month the Debtors typically paid approximately: (a) $32,000 on account of Employee claims that arose under their self-funded dental plan, and (b) $2,300 on account of Metlife administration fees. The Debtors' self-funded dental plan provides a maximum of $2,000 in benefits to any covered individual each year.

52.     The Debtors are not certain of the precise amount of self-funded Health Benefits claims that have accrued against them and were owing as of the Petition Date because Blue Cross and Met Life may not have: (a) received all claims from providers; (b) processed such claims; and/or (c) authorized payment for all such claims.

53.     The Debtors provide Employees with access to eye care insurance provided by Reliance Standard Life Insurance Company ("Reliance"). The monthly premium for Employee eye care insurance ranges from approximately $6 to $15 per Employee, depending on the level of coverage elected and the number of additional insureds covered. Prior to the Petition Date, each month the Debtors typically paid Reliance approximately $5,500 in premium costs for the Reliance eye care insurance. Other than the payment of their share of the premium costs, which is defrayed by Employee contributions, the Debtors generally incur no liability under the Reliance eye care insurance program.

16

54. The Debtors also provide certain of their Employees with other insurance benefits (the "Employee Insurance Benefits"), as described below.

55. The Debtors provide all full-time salaried and union Employees with basic life and accidental death and dismemberment insurance from Reliance, at no cost to the Employee. Employees who receive basic life insurance may elect to purchase supplemental life and accidental death and dismemberment insurance from Reliance, but must pay 100% of the premium cost related to such supplemental coverage. The Debtors also provide all full time salaried Employees with long-term disability ("LTD") insurance from Reliance, at no cost to such Employees. Prior to the Petition Date, each month the Debtors paid approximately $30,000 in premiums to Reliance for the basic life, accidental death and dismemberment, and LTD insurance described herein. Other than the cost of these premiums, the Debtors generally incur no obligation to their Employees or Reliance on account of this insurance.

56. The Debtors also maintain a self-funded short-term disability ("STD") insurance plan for the benefit of their full-time salaried and union Employees. Under the terms of the Debtors' self-funded STD insurance plan: (a) non-union Employees are eligible to receive up to 66 2/3% of their gross weekly pay for each week that they are disabled, subject to a maximum weekly payment of $3,500; (b) Employees covered by the Pontiac Labor Agreement are eligible to receive up to $320 each week that they are disabled; and (c) Employees covered by the Niles Labor Agreement are eligible to receive up to $275 each week that they are disabled. The Debtors' STD and LTD insurance programs are administered by Reliance, with the operational assistance of Matrix Absence Management, Inc., which the Debtors believe may be a division or corporate affiliate of Reliance. Prior to the Petition Date, each month the Debtors

typically paid approximately: (a) $15,135 on account of Employee claims that arose under their self-funded STD insurance program, and (b) $28,013 on account of related administration fees.

57.     The Debtors provide the Employees with certain other benefits listed in the following paragraphs (the "Other Benefits").

58.     The Debtors offer their non-union Employees and Employees covered by the Niles Labor Agreement the use of flexible healthcare spending accounts, which allow Employees to set aside funds on a pre-tax basis to pay for various medical, vision, dental and drug costs not otherwise covered or payable under the other benefit plans (the "Flexible Spending Account Plan"). The Flexible Spending Account Plan is administered by Ceridian FSA ("Ceridian"). The Debtors pay Ceridian an administration fee of approximately $180 each month.

59.     The Flexible Spending Account Plan, including related fees and expenses of Ceridian, is almost completely fully funded through contributions by participating Employees. Employee contributions are deducted from Employees' regular paychecks.

60.     Under the Niles Labor Agreement: (a) certain union Employees are eligible to earn a "perfect attendance bonus" if they do not miss scheduled work for an entire fiscal quarter (the "Perfect Attendance Program"); and (b) employees who have worked for the Debtors (or the Debtors' predecessors) for five and ten years, respectively, are eligible for an anniversary bonus (the "Anniversary Program"). Under the Perfect Attendance Program, certain eligible Employees may still be eligible for a bonus day because they have not missed a scheduled day of work since October 1, 2008. Under the Anniversary Program, certain union Employees may be eligible to receive a bonus in the approximate amount of one weeks' pay as a reward for their lengthy employment with the Debtors.

DB02:7696577.2                                        067999.1001

61.     Prior to the Petition Date and in the ordinary course of their business, the Debtors reimbursed (either directly or via payment of credit cards issued to the Employees in the name of the Debtors) Employees and officers for certain expenses incurred in the scope of their employment, including reimbursement of certain tools and other materials under the terms of the Labor Agreements.    As of the Petition Date, the Debtors estimate that they owe approximately $60,000 on account of Employee reimbursable expenses relating to, among other things, business-related travel expenses, business meals, car expenses, mileage reimbursement, tool reimbursement, and miscellaneous business expenses (collectively, the "Reimbursable Expenses").    All of the Reimbursable Expenses were incurred by the Employees on the Debtors' behalf and with the understanding that they would be reimbursed.

62.     The Debtors' books and records indicate that in no instance should the amount of prepetition wages, salaries, and contractual compensation owing to an Employee exceed the sum of $10,950, which amount is allowable as a priority claim under section 507(a)(4) of the Bankruptcy Code.    Moreover, the Debtors only seek authority to make Employee payments up to the statutory maximums of $10,950 (on account of wages and compensation allowed as a priority claim under section 507(a)(4) of the Bankruptcy Code) and $10,950 (on account of contributions to employee benefit plans allowed as a priority claim under section 507(a)(5) of the Bankruptcy Code).

## C.     Prepetition Tax Motion

63.     The Debtors, in the ordinary course of their business, incur various Other Taxes. The process by which the Debtors remit the Other Taxes varies, depending on the nature of the tax at issue and Taxing Authority to which the relevant tax is paid.

64. In connection with the normal operation of their business, the Debtors are sometimes required to collect Sales and Use Taxes and must remit these taxes to various governmental entities of the jurisdictions in which the Debtors conduct business. The process by which the Debtors remit Sales and Use Taxes varies, depending on the nature of the tax at issue and Taxing Authority to which the relevant tax is paid.

65. The Debtors also are required by certain regulatory authorities to pay certain Regulatory Fees. The process by which the Debtors remit such Regulatory Fees varies, depending on the nature of the fee at issue and the regulatory authority to which the relevant Regulatory Fee is paid.

66. As of the Petition Date, the Debtors estimate a prepetition outstanding balance of approximately $1,188,280 related to the Taxes and Regulatory Fees, including approximately $768,000 for Sales and Use Taxes through December 31, 2008. Over the past twelve (12) months, the Debtors have paid approximately $395,000 in Other Taxes, $7,769,378 in Sales and Use Taxes, and $22,067 in Regulatory Fees. Prior to the Petition Date, the Debtors paid, on an estimated basis, some but not all of the prepetition accrued and unpaid amounts outstanding on account of the Taxes and Regulatory Fees.

67. The Debtors pay the Taxes and Regulatory Fees to the Taxing Authorities on a periodic basis with funds drawn by checks (the "Checks") or by means of electronic fund transfers (the "Electronic Transfers"), either directly to the Taxing Authorities or to a third party administrator who pays the appropriate Taxing Authorities. Prior to the Petition Date, certain Taxing Authorities were sent Checks or Electronic Transfers in respect of such obligations that may not have cleared the Debtors' banks or other financial institutions

DB02:7696577.2                                                                 067999.1001

(together, the "Banks") as of the Petition Date. The Debtors have also not received certain bills from certain Taxing Authorities for prepetition taxes owed.

### D.    Account Maintenance and Cash Management Motion

68.    Prior to the Petition Date, the Debtors, in the ordinary course of their business, maintained numerous Bank Accounts.

69.    Dismantling the Debtors' cash management system would likely disrupt the Debtors' relationships with their key stakeholders and may hinder their abilities to continue operations pending a going-concern sale.

70.    Maintenance of the Bank Accounts would greatly facilitate the Debtors' transition to post-petition operations and preserve the value of the Debtors for Mecalux or any other purchaser that results from the proposed sale process. Closing the Bank Accounts and transferring the funds in those accounts to newly created post-petition accounts would be disruptive and time consuming. Moreover, requiring the Debtors to close or alter the Bank Accounts would greatly complicate and disrupt the cash management system currently in place, likely to the detriment of the Debtors' estates and creditors.

71.    The Debtors currently maintain the Bank Accounts at Nat City and other Banks.

72.    The Debtors maintain current and accurate accounting records of daily cash transactions. Maintenance of this cash management system will prevent undue disruption to the Debtors' businesses and operations, while protecting their cash for the benefit of their estates.

73.    Interlake's customer receipts and deposits generally flow through the cash management system as follows. Certain of Interlake's receipts are deposited into NCB Lockbox #2027 (the "IMH Lockbox"). The balance of the IMH Lockbox is swept nightly to

the IMH Cash Concentration Account #******4073 (the "IMH Concentration Account"). Other deposits, mostly from credit cards, and NCB branches and payments made via wire and ACH transfer, are made directly to the IMH Concentration Account. The IMH Concentration Account pays down the Debtors' secured working capital facility with Nat City (the "Senior Secured Line of Credit") on a daily basis. The Senior Secured Line of Credit[5] advances funds, upon request, to the NCB IMH, Inc. Operating/ Funding Account #******4081 (the "IMH Funding Account"), which, in turn, disburses funds to: (a) the NCB Interlake Material Handling, Inc. A/P Account #**4126 (the "IMH Main Payables Account"), which IMH uses to pay the majority of its ordinary course accounts payable, including payments to suppliers; (b) the NCB Interlake Material Handling, Inc. Salaried Payroll Account #**6228 (the "IMH Salaried Payroll Account"), which funds payroll for IMH's salaried employees; and (c) the NCB Interlake Material Handling, Inc. Direct Pay Account #**6244 (the "IMH Direct Pay Account"), which funds direct payroll deposits to certain of the Debtors' employees. The IMH Main Payables Account also funds IMH accounts at Wachovia Bank and Freestar Bank, which fund payroll for the Debtors' employees in Sumter, South Carolina and Pontiac, Illinois, respectively.

74.     United Fixtures' customer receipts and deposits generally flow through the Debtors' cash management system as follows. United Fixtures' corporate accounts receivable are deposited into NCB Lockbox #2203 (the "United Fixtures Lockbox"). The balance of the United Fixtures Lockbox is swept nightly to the NCB United Fixtures Cash Concentration Account #*****8201 (the "United Fixtures Concentration Account"). The United Fixtures Concentration Account pays down the NCB Line of Credit on a daily basis. The NCB Line of

---

[5]     Post-petition, the DIP Loan will likely take the place of the Senior Secured Line of Credit, in accordance with orders of this Court.

Credit advances funds, upon request, to the NCB United Fixtures Funding Account #*****8228 (the "United Fixtures Funding Account"), which, in turn, funds the NCB United Fixtures Company Accounts Payable Account #**4720 (the "United Fixtures A/P Account"). In the ordinary course of business, United Fixtures pays its suppliers and other vendors from the United Fixtures A/P Account. United Fixtures also funds its payroll from the United Fixtures A/P Account, by either: (a) issuing payment directly to employees from that account; or (b) by funding Electronic Commerce, Inc., a payroll processor, who then issues payment to the employees.

75.     Customer receipts and deposits from J&D generally flow through the cash management system as follows. J&D's corporate accounts receivable are deposited into NCB Lockbox #2609 (the "J&D Lockbox"). The balance of the J&D Lockbox is swept nightly to the United Fixtures Concentration Account, which in turn pays down the Senior Secured Line of Credit on a daily basis. The NCB Line of Credit advances funds, upon request, to the NCB United Fixtures Funding Account #*****8228 (the "United Fixtures Funding Account"), which, in turn, funds the NCB J&D Accounts Payable Account #*****3200 (the "J&D A/P Account"). In the ordinary course of business, J&D pays its suppliers and other vendors from the J&D A/P Account. J&D also will fund its payroll from the J&D A/P Account, by either: (a) issuing payment directly to employees from that account; or (b) by funding Electronic Commerce, Inc., a payroll processor, who then issues payment to the employees.

76.     Given the corporate and financial structure of the Debtors, it would be difficult, if not impossible, for them to establish an entirely new system of accounts and a new cash management system, as of the Petition Date. For example, if the Debtors were required to open

23

separate accounts as debtors in possession and rearrange their cash management system, there would be delays in the Debtors' ability to operate their businesses.

### E. Customer Programs Motion

77.     Prior to the Petition Date and in the ordinary course of their businesses, the Debtors offered their catalog and other customers Rebates, Warranties and Customer Credits (each as defined below and, together, the "Customer Programs") to develop and sustain positive relationships with their customers and a good reputation in the marketplace. The common goals of the Customer Programs are to meet competitive pressures, ensure customer satisfaction, and generate goodwill for the Debtors, thereby helping the Debtors to retain current customers, attract new ones, and ultimately enhance revenue and profitability.

78.     The Debtors believe that the Customer Programs are successful business strategies and that the costs of the Customer Programs are, in the aggregate, more than offset by the revenue they generate. The Debtors also believe that the Customer Programs play a critical role in the purchasing decisions of the Debtors' customers. Partially as a result of the Customer Programs, the Debtors have engendered loyalty among their customers.

79.     The Debtors maintain a wide variety of prepetition warranty programs (collectively, the "Warranty Programs") in support of their products. The Debtors generally provide warranties to their customers on account of the shelving sold directly to such customers (collectively, the "Warranties").

80.     The Debtors believe that the Warranties solidify existing customer relationships and assist in the development of new customers and the sale of newer products. Although the Debtors have rigorous internal quality controls, any doubts regarding the Debtors' ability to manufacture high quality products, or their willingness to make assurances of quality through a Warranty, could result in customers sourcing their supply needs elsewhere. Moreover, the

24

Debtors anticipate that any purchaser of their assets will continue to honor Warranty claims, which means that the Debtors' failure to honor such claims in bankruptcy may jeopardize such Warranty and lower the Debtors' going-concern value.

81.     At a minimum, the Debtors back all of their products with a one year basic Warranty.  Under this basic Warranty, the Debtors will repair or replace defective product within one year of sale.  Certain other customers pay for extended Warranties, many of which are contractual obligations.  Extended Warranties often provide coverage for damage to products, in addition to product defects, and provide coverage for longer than one year.

82.     Given the length of the Warranties and the delay between their issuance and the assertion of Warranty claims, Warranties issued by the Debtors prior to the Petition Date may give rise to prepetition, contingent claims that may remain contingent for a number of years.

83.     During the fiscal year ended June 29, 2008, the Debtors paid approximately $29,000 in basic Warranty claims.  At the end of the fiscal year ended June 29, 2008, the Debtors' books and records included a $78,000 reserve for basic Warranty liability.  Although the payment terms for extended Warranties are different for each Warranty, the Debtors believe that they have adequate reserves to continue to service each such Warranty for the foreseeable future.  The Debtors believe that the cost of honoring their Warranty obligations is far less than the potentially irreparable damage that could be done to their businesses if they were to repudiate these obligations to their customers.  As such, the Debtors believe that it is critical that they be granted authority to honor their Warranty obligations.

84.     From time to time, customers of the Debtors may become entitled to credits or allowances (collectively, the "Customer Credits") from the Debtors.  Customer Credits generally arise from: (a) inadvertent overbilling by the Debtors; (b) overpayment or

25

bar

Debtors anticipate that any purchaser of their assets will continue to honor Warranty claims, which means that the Debtors' failure to honor such claims in bankruptcy may jeopardize such Warranty and lower the Debtors' going-concern value.

81.     At a minimum, the Debtors back all of their products with a one year basic Warranty.  Under this basic Warranty, the Debtors will repair or replace defective product within one year of sale.  Certain other customers pay for extended Warranties, many of which are contractual obligations.  Extended Warranties often provide coverage for damage to products, in addition to product defects, and provide coverage for longer than one year.

82.     Given the length of the Warranties and the delay between their issuance and the assertion of Warranty claims, Warranties issued by the Debtors prior to the Petition Date may give rise to prepetition, contingent claims that may remain contingent for a number of years.

83.     During the fiscal year ended June 29, 2008, the Debtors paid approximately $29,000 in basic Warranty claims.  At the end of the fiscal year ended June 29, 2008, the Debtors' books and records included a $78,000 reserve for basic Warranty liability.  Although the payment terms for extended Warranties are different for each Warranty, the Debtors believe that they have adequate reserves to continue to service each such Warranty for the foreseeable future.  The Debtors believe that the cost of honoring their Warranty obligations is far less than the potentially irreparable damage that could be done to their businesses if they were to repudiate these obligations to their customers.  As such, the Debtors believe that it is critical that they be granted authority to honor their Warranty obligations.

84.     From time to time, customers of the Debtors may become entitled to credits or allowances (collectively, the "Customer Credits") from the Debtors.  Customer Credits generally arise from: (a) inadvertent overbilling by the Debtors; (b) overpayment or

DB02:7696577.2

067999.1001

prepayment by the customer; (c) an agreement between the Debtors and a customer to decrease the price of certain goods or services, which price decrease was not reflected immediately on the invoices issued by the Debtors; or (d) product returned to the Debtors by the customer (whether the product was defective, non-conforming, or for some other reason). As a result, the Debtors sometimes retroactively adjust the price of prior invoices through the issuance of a Customer Credit.

85.     In addition, from time to time the Debtors' customers are entitled to Customer Credits due to problems with the goods shipped by the Debtors to their customers. The Debtors occasionally ship: (a) too much or too little of a product; (b) nonconforming goods; or (c) goods that were not ordered by the customer. When such problems arise in a shipment of goods, the Debtors may remedy these problems by issuing Customer Credits.

86.     Some transactions that would give rise to a Customer Credit under the Debtors' normal customer practices occurred prior to the Petition Date, thus giving rise to a right to receive a Customer Credit, but the resulting Customer Credit may not have yet been issued as of the Petition Date. The Debtors issue approximately $50,000 in Customer Credits in a typical calendar month, exclusive of amounts issued to customers with contracts that contemplate the issuance of credits. As of the Petition Date, the Debtors estimate that the aggregate amount of these accrued Customer Credits is less than $75,000. In addition to these amounts, additional prepetition customer credits have accrued or may have accrued to customers with whom the Debtors have executory contracts that provide for the issuance of credits.

87.     The Debtors believe that a refusal to honor accrued Customer Credits or to issue new Customer Credits based upon prepetition or post-petition activities would engender substantial ill will among the Debtors' customers, would erode the Debtors' customer base, and

26

damage the Debtors' going concern and sale value. Thus, the Debtors submit that any short-term savings that could be obtained through disavowing Customer Credits would be more than offset by the resulting long-term losses and/or reduction in purchase price.

88.     In connection with the Debtors' sales programs, and targeted largely to their catalog customers, the Debtors offer their customers Rebates that generally are tied to volume sales. Customers eligible for Rebates accrue them over the course of each fiscal quarter. At the end of each quarter, customers can collect the cash value of the Rebates that accrued over the quarter, apply the value of the Rebates against current purchases, or allow the Rebates to continue on the Debtors' books until they are ready to be used. The Debtors offer these programs to provide customers with an incentive to purchase volume of products from the Debtors. In some instances, the Customer Rebates are contractually-based or otherwise have been promised to the customers.

89.     In fiscal year ended June 29, 2008, the Debtors provided their customers with approximately $300,000 in Rebates. The Debtors estimate that, as of the Petition Date, customers had accrued and unused Rebates with a value of approximately $136,000. Failure to honor and apply or pay the outstanding Rebates would be perceived by the Debtors' customers as a repudiation of the parties' agreements and would antagonize the Debtors' customer base. This may negatively affect the Debtors' going-concern value. As such, the Debtors submit that the cost of honoring and paying the Rebates is less than the harm that could be caused by not paying such amounts.

90.     The Debtors' businesses are dependent upon the loyalty and confidence of their customers, whose continued support is absolutely essential to the Debtors' sale process. Any delay in honoring or paying various obligations related to the Customer Programs will severely

27

and irreparably impair the Debtors' customer relations at a time when the continued loyalty and support of their customers are extremely critical to the Debtors and their potential purchasers. Indeed, such failure to honor these obligations could destroy goodwill built over years with respect to many of the Debtors' longstanding relationships. In addition, the failure to honor certain of these obligations would result in customers recovering these amounts in any event, or attempting to recover these amounts, through setoff or recoupment. By contrast, honoring these prepetition obligations will require a limited and reasonable expenditure of estate funds and will assist the Debtors in preserving their key customer relationships to the benefit of all stakeholders

### F.     DIP Financing Motion

91.     The Debtors request that the Court authorize them to obtain senior secured, superpriority postpetition financing in the aggregate not to exceed $41,446,000 pursuant to the terms of the DIP Credit Agreement and the DIP Orders.

92.     Without immediate access to the DIP Facility, the Debtors will not have the liquidity required to continue operations and/or solicit bids and consummate a going-concern sale or sales of substantially all of their assets. The Debtors require the DIP Facility to be able to pay their payroll and operating expenses (including the costs and expenses of these chapter 11 cases) and generally preserve their going concern and asset value. The going-concern sale of substantially all of the Debtors' assets will allow the Debtors to realize the highest possible value of their business for the benefit of their creditors. Accordingly, the DIP Facility is necessary for a successful sale or sales that will allow creditors to realize the maximum value on account of their claims and the absence of such funds would immediately and irreparably harm the Debtors, their estates and their creditors.

93. Prior to the Petition Date, the Debtors surveyed various sources of postpetition financing. In exploring those options, the Debtors recognized that the obligations owed to the Prepetition Senior Secured Parties are secured by first-priority liens on virtually all of the Debtors' property, such that either: (i) the liens of the Prepetition Senior Secured Parties would have to be primed to obtain postpetition financing; (ii) the postpetition lender would be required to refinance the obligations of the Prepetition Senior Secured Parties in full and provide additional loan availability; or (iii) the Debtors would have to find a postpetition lender willing to extend credit that would be junior to the Prepetition Senior Secured Parties' liens. Because the Prepetition Senior Secured Parties advised the Debtors' representatives that they would not consent to be primed by another lender group, borrowing from another postpetition lender or lending group that required liens and claims senior to that of the Prepetition Senior Secured Parties likely could only be accomplished through an extended, contested hearing to determine compliance with the requirements of section 364(d) of the Bankruptcy Code.

94. In view of these circumstances, the Debtors concluded that the NCBC proposal was desirable because, among other things, it permits the Debtors to secure necessary postpetition financing to continue operations and avoid an extended, contested hearing under section 364(d) of the Bankruptcy Code.

95. The Debtors and NCBC engaged in extensive, arms'-length negotiations with respect to the terms and conditions of the DIP Credit Agreement. Importantly, the DIP Credit Agreement provides that the Debtors may draw immediately (on an interim basis) to meet their administrative and operational obligations during the early stages of these chapter 11 cases, a very critical period for preserving going-concern values.

DB02:7696577.2

067999.1001

96.     The Debtors and NCBC have also agreed upon a budget (the "Budget")
projecting cash flow for thirteen weeks. On a weekly basis, the Debtors will provide to
NCBC an updated budget. The Debtors believe that the Budget is achievable and will
allow them to operate and pay their postpetition obligations as they mature.

97.     The provisions of the DIP Credit Agreement were extensively negotiated. The
DIP Credit Agreement enables the Debtors to obtain the financing necessary to maintain their
operations and pursue a going-concern sale and maximization of value of their estates.

98.     In order to address their working capital needs and fund their bankruptcy cases,
the Debtors also require the use of cash collateral of the Prepetition Senior Secured Parties and
the Prepetition Junior Secured Parties (the "Cash Collateral") and the proceeds of the DIP
Facility. The proceeds of the DIP Facility will provide the Debtors with the additional
necessary capital with which to operate their business, pay their employees, maximize value,
and pursue a going-concern sale under chapter 11.

99.     The Prepetition Senior Secured Parties have consented to the Debtors' use
of Cash Collateral on the terms set forth in the DIP Financing Motion, subject to the
adequate protection liens and payments discussed below, and the other terms and
conditions set forth in the Interim DIP Order.

100.    Approval of the DIP Facility will provide the Debtors with immediate and
ongoing access to borrowing availability to pay their current and ongoing operating expenses,
including postpetition wages and salaries and utility and vendor costs. Unless these expenses
are paid, the Debtors will be forced to cease operations, which would likely: (a) result in
irreparable harm to their business; (b) deplete going concern value; and (c) jeopardize the
Debtors' ability to consummate the contemplated sale and maximize value. The credit

DB02:7696577.2

067999.1001

provided under the DIP Credit Agreement and the use of Cash Collateral will enable the Debtors to continue to satisfy their vendors, service their customers, pay their employees and operate their business in the ordinary course, pending the proposed sale, and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all stakeholders. The availability of credit under the DIP Credit Agreement will provide confidence to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors. Accordingly, the timely approval of the DIP Facility is imperative.

101. The Debtors' liquidity needs can be satisfied only if the Debtors are immediately authorized to borrow under the DIP Facility and to use such proceeds to fund their operations. The Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b) or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1). The Debtors have not been able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought.

102. Substantially all of the Debtors' assets are encumbered and the Debtors have been unable to procure the required funding absent granting the proposed superpriority claims and liens. The Debtors submit that the circumstances of this case require the Debtors to obtain financing pursuant to section 364(c) and section 364(d) of the Bankruptcy Code and, accordingly, the DIP Credit Agreement reflects the exercise of their sound business judgment.

103.    The terms and conditions of the DIP Credit Agreement are fair and reasonable and were negotiated extensively by well-represented, independent parties in good faith and at arms' length.  Accordingly, the DIP Secured Parties and all obligations incurred under the DIP Credit Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code.

104.    The Debtors require the use of Cash Collateral as set forth in the DIP Financing Motion.  Indeed, absent such relief, the Debtors' business will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.  The interests of the Prepetition Secured Parties in the Cash Collateral will be protected by the adequate protection set forth above.  The Prepetition Senior Secured Parties have consented to the use of the Cash Collateral on the terms set forth herein and in the Interim DIP Order.

105.    The Debtors have an urgent and immediate need for cash to continue to operate.  Currently, the Debtors do not have sufficient funds with which to operate their business on an ongoing basis.  Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on the Motion, the Debtors will be immediately and irreparably harmed.  The availability of interim loans under the DIP Facility will provide necessary assurance to the Debtors' vendors, employees and customers of their ability to meet their near-term obligations.  Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' business, to the detriment of all parties in interest.  Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtors.  Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating their reorganization efforts.

DB02:7696577.2                    067999.1001

## G.    Utilities Motion

106.    The Debtors currently use electric, natural gas, heat, water, sewer and other similar services provided by the Utility Companies. The Debtors' Utility Companies provide traditional utility services related to the day-to-day operation of the Debtors' various facilities and offices. The Debtors estimate that their aggregate average monthly obligations to the Utility Companies on account of services rendered total approximately $370,000. The Debtors believe that they are generally current on all prepetition obligations due the Utility Companies, other than the accrued, but unbilled, prepetition obligations for utility services.

107.    Uninterrupted service from the Utility Companies is essential to the Debtors' continued operation and successful sale of substantially all of their assets. The Debtors could not maintain their facilities in the absence of continuous service. It is therefore critical that the Utility Companies continue to provide uninterrupted services to the Debtors.

108.    The Debtors intend to timely pay their postpetition obligations to the Utility Companies. The Debtors will make these payments with cash generated during these chapter 11 cases, the proceeds of the DIP Loan (if approved), and orders of this Court authorizing use of cash collateral and debtor in possession financing.

## H.    Retention of Kurtzman Carson Consultants

109.    The Debtors seek to employ and retain KCC as notice, claims, and balloting agent pursuant to  28 U.S.C. §156(c).

110.    The Debtors have more than 200 potential creditors.

111.    The fees to be charged by KCC in connection with these chapter 11 cases are set forth in the Services Agreement. The Debtors respectfully submit that KCC's rates for its services in connection with the notice and claims processing services are competitive and comparable to the rates charged by their competitors for similar services.

### I.    Bid Procedures and Asset Sale Motion

112.    The Debtors are requesting, pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6003, 6004, 6006, and 9006, entry of (i) an order (the "Bid and Sale Procedures Order") (a) setting the time, date, and place of a hearing (the "Sale Hearing") to consider the sale (the "Sale") of the substantial majority of the Debtors' assets to the Purchaser or to the qualified bidder with the highest or otherwise best bid at an auction (the "Auction") to be conducted at a date to be determined by this Court, (b) approving the Bid Procedures for the conduct of the Auction, and (c) approving the Break-Up Fee and Expense Reimbursement, and (ii) a Sale Order approving (a) the Sale to either the purchaser under the Acquisition Agreement between Mecalux (the "Purchaser") or to the qualified bidder with the highest or otherwise best bid at the Auction (including, possibly, the Purchaser, the "Successful Bidder"), in either case free and clear of all liens, claims, encumbrances, and other interests, (b) the assumption and assignment of executory contracts and unexpired leases identified in the Acquisition Agreement or the purchase agreement of another Successful Bidder, pursuant to section 365 of the Bankruptcy Code.

113.    Consummation of the Sale is critical in these chapter 11 cases. The Debtors do not have the financial wherewithal to continue operations without additional financing. Moreover, as set forth in the Debtors' motion seeking approval of debtor-in-possession financing, the Debtors do not believe that they will be able to secure alternate debtor-in-possession financing over the objection of their existing senior secured lenders.

114.    The Sale to the Purchaser or another Successful Bidder will maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders and, accordingly, is in the best interests of the Debtors, their creditors, and their other economic stakeholders. The

DB02:7696577.2

067999.1001

Purchaser is a third party, not comprised of insiders of the Debtors, with no affiliation to the Debtors. The relief requested in the Sale and Bid Procedures Motion should be granted.

115.    Pursuant to the Acquisition Agreement, the Purchaser has agreed to purchase, for a purchase price of $30 million, the assets related to Debtors' retail rack, non retail rack, installation services, and IK de Mexico racking businesses and their Lexington automation controls and integration business, including without limitation inventory, permits, intellectual property and real property related thereto, all as more fully described in Section 1.1 of the Acquisition Agreement. The Acquired Assets will also include the following wholly owned subsidiaries of the Debtors: (i) Interlake de Mexico, S.A. de C.V., (ii) Industrias Interlake S.A. de C.V., (iii) Empresas Interlake de Matamoros, S.A. de C.V., and (iv) NSF Mexicali S. de R.L. de C.V (collectively, the "Transferred Subs"). In addition, the Debtors will assume and assign to the Purchaser certain of the Debtors executory contracts and unexpired leases related to the other Acquired Assets.

116.    The Acquired Assets do not include the Debtors' non debtor affiliate, J&D Company LLC, cash, accounts receivable and other miscellaneous assets as more fully described in Section 1.2 of the Acquisition Agreement. The Acquisition Agreement also provides a mechanism for the Debtors to receive the value of the accounts receivable of the Transferred Subs net of outstanding liabilities of the Transferred Subs.

117.    Other than liabilities under Assumed Contracts arising after the closing and other liabilities specifically listed in the Acquisition Agreement, the Purchaser is not assuming any of the Debtors pre-closing liabilities, as more fully described in Sections 1.3 and 1.4 of the Acquisition Agreement. Subject to adjustments in the event cure claims exceed $2 million, the Debtors are responsible for paying all cure claims related to the Assumed Contracts. The

DB02:7696577.2                                                                 067999.1001

Acquisition Agreement also provides for an escrow of $1.35 million of the purchase price which will be payable to Purchaser in the event of any loss associated with pre-closing liabilities of the Transferred Subs, Purchaser is held liable for an Excluded Liabilities, or certain other conditions occur as more fully described in the Acquisition Agreement.

118.    The Acquisition Agreement provides bid protections to the Purchaser in the form of a Break-Up Fee in the amount of $450,000 and Expense Reimbursement up to $400,000 in the event the Purchaser is not the successful bidder or the transaction fails to close for other specified reasons not caused by the Purchaser's breach of the Acquisition Agreement.

119.    In connection with the Acquisition Agreement, the Purchaser has made a good faith deposit of $450,000, the Debtors and the Purchaser have executed a Deposit Escrow Agreement.  The Deposit Escrow Agreement sets for the parameters under which the escrow will be paid to Purchaser or the Debtors, as applicable.

120.    While the Debtors believe that the Acquisition Agreement is fair and reasonable, the Debtors believe that the best interests of their estates are served by conducting a public Auction to identify the highest or otherwise best offer for their assets.  Accordingly, the Debtors will seek approval of the Acquisition Agreement with the Purchaser only in the event that the Auction does not yield an offer that is higher or otherwise better than the Acquisition Agreement.  To determine if a higher or otherwise better offer exists, the Debtors seek the Court's approval of the Bid Procedures.  The proposed Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances because they will serve to maximize the value that the Debtors will recover on account of the sale.

DB02:7696577.2

067999.1001

121.   The Debtors believe that the Bid Procedures establish the parameters under which the value of the Debtors' assets may be maximized at the Auction and ensuing Sale Hearing.  Such procedures unquestionably will increase the likelihood that the Debtors will receive the greatest possible consideration for such assets because they will ensure a competitive and fair bidding process.

122.   One important component of the Bid Procedures is the "overbid" provision, pursuant to which any initial offer for the Purchased Assets must be in an amount of at least $1 million more than the $30 million purchase price offered by the Purchaser; plus the amount of the Break-up Fee and Expense Reimbursement.  Accordingly, there is an initial approximate 6% overbid for the Assets.   Indeed, a minimum initial overbid is necessary not only to compensate the Debtors for the risk that they assume in foregoing a known, willing, and able purchaser for a new potential acquirer, but also to ensure that there is an increase in the net proceeds received by the estates, after deducting the Break-Up Fee and Expense Reimbursement to be paid to the Purchaser in the event of a prevailing overbid.

123.   The Bid Protections are fair and reasonable in amount, particularly in view of the efforts that have been and will be expended by the Purchaser.   Moreover, the Bid Protections will enable the Debtors to secure an adequate floor for the Auctions and, thus, insist that competing bids by materially higher or otherwise better than the Purchaser's initial bid, a clear benefit to the Debtors' estates.

124.   In sum, the Debtors' ability to offer the Bid Protections enables them to ensure the sale of the Debtors' assets to a contractually-bound bidder at a  price that they believe to be fair while, at the same time, providing them with the potential of even greater benefit to the estates.  Thus, the Bid Protections should be approved.

DB02:7696577.2                                                                                     067999.1001

125.     To facilitate and effect the Sale of the Debtors' assets to the Purchaser, and likely any other Successful Bidder, the Debtors seek authorization to assume and assign certain contracts and unexpired leases in connection with the Sale.  The Purchaser has identified contracts and leases of which it requires assignment as part of the Acquisition Agreement and it is likely that any other Successful Bidder will also require the Debtors to assume and assign to it certain executory contracts and unexpired leases in order to realize the maximum going-concern value of the Debtors' business enterprise.  In order to provide counterparties with adequate notice of such assumption and proposed adequate cure amounts (the "Cure Amounts"), the Debtors and/or the Successful Bidder propose the Assumption & Assignment Procedures.

126.     The Debtors believe that the Assumption & Assignment Procedures will provide the counterparties to the Assumed Contracts a full and fair opportunity to b heard with respect to issues concerning the proposed assumption and assignment of the Assumed Contracts, wither to the Purchaser or another Successful Bidder.

127.     The assumption and assignment of the Contracts to the Purchaser or another Successful Bidder is in the best interests of the Debtors' estates and a proper exercise of the Debtors' business judgment.  In addition to maximizing the consideration received in exchange for the Sale, it also allows the Debtors to avoid rejection damages that otherwise would accrue if those contracts or leases were to be rejected.  The Debtors have agreed to pay all undisputed cure amounts associated with assumption and assignment of the leases and contracts up to a cap, which are estimated to be approximately $1.4 million under the Acquisition Agreement.

DB02:7696577.2     067999.1001

128. At the Sale Hearing, the Debtors and the Successful Bidder will be prepared to proffer testimony or present evidence to demonstrate the financial credibility, willingness, and ability of Purchaser or other Successful Bidder to perform under the contracts and leases to be assumed and assigned. The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the contracts and leases to be assumed and assigned, as required by section 365(b)(1)(C) of the Bankruptcy Code.

129. The Debtors wish to proceed to the Auction and Sale Hearing as expeditiously as applicable law and the Court's calendar will allow, but still will give the requisite notice of the Sale.

130. The Auction will be well-publicized and conducted in accordance to procedures approved by this Court. Moreover, under the circumstances, the Sale to the Successful Bidder will maximize the value of the Debtors' assets for the benefit of all of the Debtors' creditors and economic stakeholders.

131. Any lien, claim, encumbrance, or interest in the Debtors' assets will be adequately protected by attachment to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto.

132. The terms and conditions of the Purchase Agreement were negotiated by the Debtors and Purchaser at arm's length and in good faith. Each party was represented by sophisticated counsel. Accordingly, the Debtors request that the Court determine that the Purchaser has acted in good faith and is entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.

### J.    Motion to Pay Shippers and Other Lien Claimants

133.    The Debtors seek the authority to pay, in their discretion and in the ordinary course of business, the prepetition claims of certain warehousemen and other lien claimants who have (or may have) state law or other remedies available to secure payment of their claims.  The Debtors propose to pay such claims where, in the Debtors' business judgment, a creditor's exercise of such remedies would unduly disrupt the Debtors' business operations.

134.    The Debtors have a reputation for reliability and dependability among their customers.  This reputation depends upon the timely receipt of supplies and materials from the Debtors' suppliers and the timely delivery of product to the Debtors' customers.

135.    The Debtors' supply and delivery system depends upon the use of operators of third-party warehouses to store goods in transit (the "Warehousemen").

136.    It is essential for the Debtors' business operations and sale efforts that they maintain a reliable and efficient supply and distribution network.  Because the Debtors are dependent on third parties for the delivery of materials and other supplies, it is essential that their bankruptcy cases not be a reason for any such party to cease timely performing services or to retain goods in its possession on account of unpaid prepetition claims.  If the Debtors are unable to receive deliveries of materials or other supplies on a timely and uninterrupted basis, their operations will be immediately and substantially impeded.  Just as critical, however, is the Debtors' ability to continue to deliver goods to the market for sale.  If the Debtors are unable to provide goods to vendors and other customers on a timely basis, the Debtors will suffer a significant loss of market share, name brand recognition and customer goodwill, as well as revenue, thereby causing substantial harm to their businesses and efforts to consummate a sale of substantially all of their assets.

DB02:7696577.2

067999.1001

137.     The Debtors employ various Warehousemen to ensure that their supply and delivery network runs smoothly and their supplies and goods arrive on time.

138.     The Debtors engage the Warehousemen to store materials to the Debtors, as well as finished products to the Debtors and their customers.

139.     As a result, in the ordinary course of business, Warehousemen regularly have possession of supplies purchased by the Debtors, as well as finished product produced by the Debtors and intended for delivery to their customers. The Debtors expect that, as of the Petition Date, certain of the Warehousemen will have outstanding invoices for goods that were delivered to the Debtors or the Debtors' customers prior to the Petition Date (the "Warehousing Claims"). The Debtors estimate that the total amount of Warehousing Claims will not exceed $212,000.

140.     A Warehouseman may have a lien on the goods in its possession, which lien secures the charges or expenses incurred in connection with the storage of such goods.[6] As a result, the Warehousemen will likely argue that they are entitled to possessory liens for storage of the goods in their possession and may refuse to deliver or release such goods before their Warehousing Claims have been satisfied and their liens redeemed.

141.     The Debtors believe that the value of the goods in the possession of the Warehousemen, and the potential injury to the Debtors if the goods are not released, is likely to greatly exceed the amount of Warehousing Claims held by such parties.

142.     Even if the Warehousemen did not have valid liens under state law, their possession (and retention) of the Debtors' goods and supplies would severely disrupt, and potentially cripple, the Debtors' operations. For these reasons, the Debtors submit that it is

---

[6]     *See, e.g.,* U.C.C. § 7-209 (warehouseman's lien).

DB02:7696577.2

067999.1001

necessary and essential to their reorganization efforts and the value of their estates that they be permitted to make payments on account of certain Warehousing Claims.

143.    In addition to the Warehousemen, the Debtors also routinely transact business with a number of other third parties (collectively, the "Lien Claimants")[7] who have the potential to assert liens against the Debtors and their property, and in some cases their customers' property, if the Debtors fail to pay for goods or services rendered prior to the Petition Date, including a number of parties with potential mechanics' liens relating to the installation of the Debtors' products.

144.    As of the Petition Date, some of the Lien Claimants may not have been paid for certain prepetition goods and services, which may result in such Lien Claimants asserting and perfecting mechanics', artisans' or processors' liens (collectively, the "Mechanics' Liens"[8]) against the Debtors' goods,[9] notwithstanding the automatic stay under section 362 of the Bankruptcy Code. Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such Mechanics' Liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the reach of the automatic stay. Under section 546(b), a debtor's lien avoidance powers "are subject to any generally applicable law that ... permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection...." 11 U.S.C. § 546(b)(1)(A).

---

[7]    By defining them as "Lien Claimants," the Debtors do not concede that they have valid liens.

[8]    The Debtors do not concede that any liens (contractual, common law, statutory or otherwise) are valid, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of all such liens, and/or to seek avoidance thereof.

[9]    For example, the Illinois Labor and Storage Lien Act grants a lien in favor of, among others, persons expending labor, skill or materials upon any chattel at the request of its owner, reputed owner or authorized agent of the owner, or the lawful possessor thereof. 770 ILCS § 45/1.

DB02:7696577.2                    067999.1001

145.     As a result, certain Lien Claimants may refuse to perform their ongoing obligations to the Debtors, including installation, service and warranty obligations, unless their prepetition claims are paid in full.

146.     The Debtors pay installers to install their shelving and other products in their customers' facilities.  At any given time, certain third party Lien Claimants may be rendering services at any of these locations, and to the extent that such Lien Claimants render services related to the Debtors' property, they may have the right to assert and perfect statutory liens under state or other law.  Such statutory liens likely would have to be settled by the Debtors (or their customers, who then would be able to seek recourse from the Debtors for such amounts via reduction of their accounts payable to the Debtors) to obtain the release of the property subject to the lien.

147.     Therefore, to avoid undue delay and to facilitate the continued operation of the Debtors' businesses and the maintenance of their facilities, the Debtors seek immediate authority to pay and discharge, on a case-by-case basis and in their discretion, the claims of all Lien Claimants that have given or could give rise to a statutory or other lien against the Debtors' equipment, materials and/or facilities and plants, regardless of whether such Lien Claimants have already perfected their interests (the "Lien Claimant Claims"); provided, however, that with respect to each Lien Claimant Claim, the Debtors will not be authorized to pay a Lien Claimant Claim unless the Lien Claimant has perfected or, in the Debtors' judgment, is capable of perfecting or may be capable of perfecting in the future, a statutory or other lien in respect of such claim.  Payment of the Lien Claimant Claims shall not be deemed to be a waiver of any rights regarding the extent, validity, perfection or possible avoidance of such liens.

DB02:7696577.2                                                                 067999.1001

148. The Debtors estimate that, as of the Petition Date, the aggregate amount of the Lien Claimant Claims is approximately $2.2 million.

149. The Debtors submit that the total amount to be paid to the Warehousemen and Lien Claimants on account of their prepetition claims is minimal compared to the importance and necessity of such parties to the Debtors' business operations and the losses that the Debtors would suffer if their operations are disrupted. Moreover, the Debtors do not believe that there are viable and timely alternatives that the Debtors would be able to use post-petition.

150. The Debtors estimate that, as of the Petition Date, the aggregate amount of the Warehousing and Lien Claimants is approximately $2.412 million.

**K.     Motion to Pay Certain Amounts Related to Insurance Policies**

151. In the ordinary course of business, the Debtors maintain numerous insurance policies providing coverage for liabilities of the Debtors, including policies for, among other things, property insurance (including building, equipment and automobile), earthquake insurance, general liability insurance, workers' compensation insurance, umbrella insurance and directors & officers insurance (collectively, with all other insurance policies, the "Policies"). The Policies are essential to the preservation of the value of the Debtors' business, property, and assets. In many cases, insurance coverage such as that provided by the Policies is required by the diverse regulations, laws, and contracts that govern the Debtors' commercial activities. Moreover, the Operating Guidelines for Chapter 11 Cases promulgated by the United States Trustee requires the Debtor to maintain, and provide proof of, insurance.

152. The Debtors maintain the Policies through a number of different insurance carriers. The total annual premiums for the Policies is approximately $2,435,209.00. While some of the Policies are prepaid, it is not always economically advantageous for the Debtors to

DB02:7696577.2                                                                                          067999.1001

pay the premiums on the Policies on a lump-sum basis. Accordingly, the Debtors pay certain Policy premiums on an installment basis and finance some premiums through third parties. The total amount outstanding on the Policies and/or the premium financing related to the Policies as of the Petition Date for which the Debtors make installment payments is approximately $3,349,962, including worker compensation claims owed by the Debtors which were outstanding as of the Petition Date of $2,665,341.

153.    If the Debtors are unable to continue making the remaining installment payments on the Policies, premium financing related to the Policies, and/or amounts owed by the Debtors to workers based upon worker compensation claims, the insurer may ultimately be permitted to terminate such Policies. The Debtors would then be required to obtain replacement insurance on an expedited basis. If the Debtors were required to obtain replacement insurance and to pay a lump sum premium for the replacement policy in advance, this payment likely would be greater than what the Debtors currently pay.

154.    In view of the importance of maintaining insurance coverage with respect to their business activities, the Debtors believe it is in the best interests of their estates to authorize the Debtors to honor their periodic obligations related to the Policies. The Debtors will need to continue their insurance coverage throughout the duration of these chapter 11 cases. By spreading out the cost of the Policies over the applicable coverage period, this provides liquidity advantages as compared to the payment of up-front lump sums for insurance coverage.

155.    Should the Debtors elect to renew any or all of these Policies, or enter into entirely new policies, the Debtors believe that such renewal or negotiation falls squarely within the ordinary course of their business. To reduce the administrative burden of these chapter 11 cases, as well as the expense of operating as debtors in possession, the Debtors seek the Court's

DB02:7696577.2                                                                                                    067999.1001

authority now to continue making payments under the Policies and premium financing related to the Policies, renew their existing Policies, and enter into new policies, all without further Court approval.

### L. Critical Vendor Motion

156.    The Debtors seek the entry of interim and final orders authorizing the payment of prepetition obligations of certain Critical Vendors, which in the Debtors' sole discretion, determine are necessary to prevent the disruption of the Debtors' operations and as appropriate, authorization for the Debtors to enter into certain Trade Agreements.  On an interim basis, the Debtors seek authority to pay approximately $650,000 to certain Critical Vendors.

157.    The Debtors manufacture heavy-duty storage solutions, serving a variety of customers in both retail and industrial markets throughout North America.  To maintain this ambitious reach, the Debtors rely upon a number of critical third-party vendors and service providers to ensure that the Debtors' businesses run smoothly and efficiently, including companies that: (a) provide sole source or limited source (for which change over to an alternative source would be costly and/or time consuming) parts and services used in the Debtors' business operations as part of the fabrication process and as component parts in the Debtors' storage racking systems (the "Sole/Limited Source Critical Vendors") and (b) provide customer-specified parts and services used in the Debtors' business operations, as part of the fabrication process and as component parts in Debtors' customer specified racking systems (the "Customer Required Critical Vendors" and, together with the Sole/Limited Source Critical Vendors, the "Critical Vendors").  These vendors and providers perform services and provide goods for the Debtors, including, without limitation, sole source vendors providing customer-specific corrugated decking, sole source vendors providing end-plates without which the

46

Debtors' products would not be functional, customer-required vendors providing conveyor equipment, and sole-regional source vendors providing galvanizing services where such services are required. Without these goods and services, the Debtors would not be able to produce their products or distribute their products to the Debtors' end customers, which would prevent the Debtors from generating a reliable revenue stream.

158. The goods and services provided by these Critical Vendors are crucial to the Debtors' continuation of their businesses and would be difficult and expensive to replace, especially in short order. Payment of the claims of Critical Vendors (the "Critical Vendor Claims") is vital to the Debtors' reorganization and sale efforts because (a) the goods and services provided by the Critical Vendors are often the only source from which the Debtors can procure such goods or services, (b) failure to pay the Critical Vendor Claims would, in the business judgment of the Debtors, result in the Critical Vendor refusing to provide its goods and/or services to the Debtors, (c) the Critical Vendors provide goods and services to the Debtors on advantageous terms, and/or (d) the Critical Vendors would themselves be irreparably damaged by the Debtors' failure to pay their prepetition claims, and if such damage caused a Critical Vendor to cease operations, this would result in the Debtors being forced to obtain goods and services elsewhere that would either be at a higher price or not of the quantity or quality required by the Debtors.

159. Certain critical vendors provide end-plates required to hold the Debtors' product together and make the Debtors' product functional, are regional-sole source galvanizers who galvanize the Debtors' product, are regional-sole source galvanizers who can handle the galvanization of large products, such as the Debtors' product, provide a unique spring loaded entry guide system that protects merchandise and the rack structure on drive in rack modules,

DB02:7696577.2

067999.1001

etc. These critical vendors are often the sole source, regional-sole source or are one of few limited sources for such goods and/or services in the United States. Switching from several of such limited source vendors to an alternate source would require weeks and would be costly and very disruptive to the Debtors' operations during this critical time during the sale process.

160.    The Debtors believe that many of the Sole/Limited Source Critical Vendors will cease providing services to the Debtors to the direct detriment of the Debtors' businesses if they are not paid amounts owing to them as of the Petition Date. These service and goods providers are retained for their specialized skills or specific expertise and their ability to create unique high quality goods and services for the Debtors' operations. Their continued uninterrupted services are essential to the Debtors' business operations and the Debtors' ability to bring the Debtors' products and services to their customers on a timely basis. The Debtors cannot afford a long-term disruption of the manufacture and distribution of their products and the revenue generated by the Debtors' business operations.

161.    Certain critical vendors provide customer-required corrugated decking placed on top of the Debtors' product that is necessary to prevent typical wire decking from imprinting into the boxes of the customer, without which the customer would not utilize the Debtors' product, customer-required vendors that provide conveyor equipment the customer utilizes in its business operations, customer-required vendor that is the sole distributors for customer-specified electrical components, including parts manufactured by Rockwell Automation, etc. The Debtors' customers require the Debtors to utilize the services of and obtain critical goods from the Customer Required Critical Vendors. Switching from several of such vendors an alternate source would not only require time and funds but would possibly result in the Debtors' loss of certain customers of the Debtors.

48

162.     The Debtors believe that many of the Customer Required Vendors will cease providing services to the Debtors to the direct detriment of the Debtors' businesses if they are not paid amounts owing to them as of the Petition Date. These service and good providers are often required to be retained by customers of the Debtors. Their continued uninterrupted services are essential to the Debtors' business operations, as without the retention of such service and good vendors many of the Debtors' customers would cease doing business with the Debtors. The Debtors cannot afford such a disruption and alteration of their revenue stream.

163.     It is crucial that the Debtors be permitted to pay selected Critical Vendors in order to continue the Debtors' businesses and to satisfy their customers' expectations. Indeed, the failure to pay these claims will result in damage to the value of the Debtors' estates as a result of, among other things, adverse impact on the quality of the goods and services provided by the Debtors to their customers including through lost sales and revenue and customer dissatisfaction.

164.     The Debtors have critically examined whether the payments of the Critical Vendor Claims are necessary. Specifically, the Debtors have undertaken a thorough review of their accounts payable and their list of prepetition vendors and service providers to identify those vendors and providers who are essential to the Debtors' operations. The Debtors have further developed certain procedures that, when implemented, will ensure that vendors and service providers receiving payment for Critical Vendor Claims will continue to supply goods and services necessary to the Debtors' businesses on a postpetition basis.

165.     In determining the amount of critical vendor claims, the Debtors consulted with the Debtors' management and department heads to identify those creditors that are most essential to the Debtors' operations, using criteria developed by the Debtors. These criteria

DB02:7696577.2                                                                                    067999.1001

included: (a) whether the vendor in question was a "sole-source" vendor; (b) whether preferences or requirements of the Debtors' customers prevent the Debtors from looking to alternative sources for a vendor's products or services; (c) whether the Debtors receive advantageous pricing or other terms from a vendor such that replacing such vendor postpetition would result in significantly higher costs to the Debtors; and (d) whether a vendor meeting the standards of (a), (b) or (c) above might additionally be forced to cease business operations (due to such vendor's own liquidity constraints) in the event its prepetition claim against the Debtors was not paid within a short time after the Petition Date.

166.    After evaluating the information received in response to these inquiries, the Debtors estimated the payment amount necessary to ensure the continued supply of critical goods and services, taking into account (a) whether failure to pay a Critical Vendor's claims would result in the Critical Vendor terminating its provision of goods and/or services to the Debtors, and (b) what percentage of the Critical Vendor's claims would need to be paid to induce it to continue providing goods and/or services to the Debtors. The Critical Vendor Cap represents this estimated amount.

167.    Moreover, the relief sought by the Debtors is intended to align with the Debtors' request, by separate motion, for Court approval to conduct an accelerated sale process for substantially all of the Debtors' assets. As noted in the Debtors' motion to approve such sale process, a key to the Debtors' value is maintaining their customer relationships, which will ensure a solid customer base for the sale of products going forward. This is expected to drive value for the benefit of creditors. An inability to obtain key products and services during the sale period could result in fulfilling less than all of the orders received from customers. The potential buyers of the Debtors' assets are aware of these risks, and the value of the Debtors'

DB02:7696577.2                                                     067999.1001

assets will only be enhanced by the relief sought herein. Thus, it is the judgment of the Debtors and their professionals that the relief sought by the critical vendor motion is critically important to the Debtors' overall goals in filing these cases.

168.     The Critical Vendor payments owed to Critical Vendors are key to the success of these chapter 11 cases. If these payments are not authorized, it is likely that Critical Vendors will stop providing goods and services to the Debtors on Customary Trade Terms, effectively reducing the amount of credit available to the Debtors. Moreover, certain of the Critical Vendors and, in turn, Debtors' customers could stop doing business with the Debtors altogether, leaving the Debtors unable to obtain certain essential goods and services, forcing the Debtors to incur higher costs to obtain certain others, and, in any event, causing such substantial delays in the production and maintenance of the Debtors' business that the Debtors may never fully recover from the harm resulting from such a delay. As further detailed below, such actions would be extremely damaging, if not devastating, to the Debtors, their estates and their creditors.

169.     In particular, continued availability of trade credit in amounts and on terms consistent with those the Debtors enjoyed prepetition is vital to the Debtors' businesses because it allows the Debtors to maintain liquidity for operations and to maintain the production and circulation systems consistent with operating profitability. Preserving working capital through the retention or reinstatement of traditional trade credit terms will enable the Debtors to maintain their competitiveness and to maximize the value of their businesses. Conversely, a deterioration of trade credit and a disruption or cancellation of deliveries of goods – many of which are not readily replaceable – would cripple the Debtors' business operations, increase the amount of funding needed by the Debtors postpetition (which funding may not be available),

DB02:7696577.2     067999.1001

and ultimately impede the Debtors' ability to service their customers, thereby placing the successful reorganization or sale of their businesses at risk.

170.    The Debtors represent that they will have sufficient cash from: reserves, ongoing operations and/or their access to cash collateral and/or debtor-in-possession financing (if approved), to pay the claims of critical vendors in the ordinary course of business.

171.    The Debtors have no direct ability to prevent Critical Vendors from shutting down the Debtors' business operations if the Debtors fail to make payment.  Accordingly, the relief requested in this Motion satisfies the requirement of Bankruptcy Rule 6003.

**M.    Motion to Reject Certain Executory Contracts**

172.    The Debtors seek authority under sections 105(a) and 365(a) of the Bankruptcy Code to reject the Contracts effective as of the Petition Date.

173.    The Debtors have evaluated each of the Contracts and, in the exercise of their business judgment, have determined that the Contracts (a) are no longer useful or beneficial to the Debtors' ongoing operations and/or (b) present potential contingent obligations that should be terminated to avoid future uncertainty.

174.    Specifically, each of the Contracts relates to either (a) lease agreements for properties at which the Debtor does not intend to operate post-petition or (b) personal property leases for equipment no longer required or which will no longer be utilized in the Debtors' post-petition operations.  Accordingly, the Contracts hold no material economic value to the Debtors or their estates and are not essential to the conduct of the Debtors' bankruptcy cases. As such, the rejection of the Contracts is in the best interests of the Debtors, their estates, their creditors and parties in interest.

DB02:7696577.2                                                                    067999.1001

175.    The Debtors may have claims against a counterparty to a Contract arising under, or independently of, the respective Contracts. The Debtors do not waive such claims by the filing of the motion to reject the Contracts or the rejection of the Contracts. The Motion to reject the Contracts should not be construed as an admission that the Contracts are executory contracts. The Debtors reserve the right to argue that any of the Contracts are non-executory and to contest any claims that arise out of the rejection of the Contracts.

## CONCLUSION

176.    Accordingly, for the reasons stated herein and in each of the motions and applications set forth above, the Debtors request that the Court approve the corresponding orders submitted with each First Day Pleading.

DB02:7696577.2                                                                                        067999.1001

I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge, information and belief.

Dated:       January 5, 2009
              Chicago, Illinois

Jacqueline M. Barry
Chief Financial Officer