# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Interlake Material Handling, Inc., *et al.*,[1] | ) | Case No. 09-10019 (KJC) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |

**Hearing Date For Bidding Procedures: January 21, 2009 at 11:30 a.m. (ET)**
**Objection Deadline for Bidding Procedures:  January 14, 2009 at 4:00 p.m. (ET)**
**Sale Hearing Date:  February 17, 2009 at 11:30 a.m. (ET)**
**Objection Deadline for Sale Hearing:  February 10, 2009 at 4:00 p.m. (ET)**

**DEBTORS' MOTION FOR ORDERS:  (I)(A) APPROVING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS, (B) SCHEDULING THE AUCTION, (C) AUTHORIZING PAYMENT OF THE BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (D) APPROVING THE DEPOSIT ESCROW AGREEMENT (E) SCHEDULING THE SALE HEARING, (E) APPROVING THE ASSUMPTION AND ASSIGNMENT PROCEDURES RELATED TO THE SALE AND (F) APPROVING THE FORM OF THE SALE NOTICE; AND (II) (A) AUTHORIZING THE SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) AUTHORIZING AND APPROVING PURCHASE AGREEMENT; (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (D) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors", or "Seller"),

hereby move the Court, pursuant to sections 105(a), 363 and 365 of title 11 of the United States

Code (11 U.S.C. §§ 101 et seq., the "Bankruptcy Code") and rules 2002, 6003, 6004, 6006 and

9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of orders

(I)(A) Approving Bid Procedures For The Sale Of Substantially All The Debtors' Assets, (B)

Scheduling The Auction, (C) Authorizing Payment Of The Break-Up Fee And Expense

Reimbursement, (D) Approving The Deposit Escrow Agreement (E) Scheduling The Sale

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Interlake Material Handling, Inc. (9435); United Fixtures Company, Inc. (2048); UFC Interlake Holding Co. (9905), and Conco-Tellus, Inc. (9950).  The address for all of the Debtors is 1230 E. Diehl Road, Suite 400, Naperville, Illinois 60563, except for United Fixtures Company, Inc., whose address is 4300 Quality Drive, South Bend, Indiana 46628.

Hearing, (E) Approving The Assumption And Assignment Procedures Related To The Sale And

(F) Approving The Form Of The Sale Notice; And (II) (A) Authorizing The Sale Of Such Assets

Free And Clear Of Liens, Claims, Encumbrances, And Other Interests; (B) Authorizing And

Approving Purchase Agreement; (C) Approving The Assumption And Assignment Of Certain

Executory Contracts And Unexpired Leases Related Thereto; And (D) Granting Related Relief

(the "Sale and Bid Procedures Motion").  The facts and circumstances supporting this Motion are

set forth in the Declaration of Jacqueline M. Barry, Chief Financial Officer of each of the

Debtors, in support of first-day motions filed concurrently herewith (the "Barry Declaration").

In support of this Motion, the Debtors further represent as follows.

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.

2.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.      Venue of these cases is proper in this District pursuant to 28 U.S.C. §§

1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105, 363

and 365 of the Bankruptcy Code and Bankruptcy Rules  2002, 6003, 6004, 6006 and 9014.

## INTRODUCTION

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code.  No creditors' committee

(the "Committee") has been appointed in these cases by the Office of the United States Trustee

(the "United States Trustee").  The Debtors are continuing in possession of their property

pending a sale of substantially all of their assets under section 363 of the Bankruptcy Code at the

Sale Hearing, as requested herein. Concurrently with the filing hereof, the Debtors filed a

motion seeking joint administration of their chapter 11 cases.

## BACKGROUND

6.      Collectively, the Debtors are a leading independent, single-source, value-

added supplier of heavy-duty storage and order fulfillment systems, serving a variety of

customers in both retail and industrial markets throughout North America.

7.      UFC Interlake Holding Co. is a holding company for its two wholly-

owned subsidiaries, United Fixtures Company, Inc. ("United Fixtures") and Interlake Material

Handling, Inc. ("Interlake"). The fourth Debtor, Conco-Tellus, Inc., is a wholly-owned

subsidiary of Interlake.

8.      United Fixtures is a leading designer and manufacturer of heavy-duty steel

storage and display racks to targeted markets throughout the United States, Canada and Mexico.

Its customers are primarily retail home centers and other specialty retailers.  United Fixtures

owns 50% of the equity in NSF Mexicali S. de R.L. de C.V. and is the parent company for the

following non Debtor entities: NSF Colombia, S. de R.L. de C.V. and J&D Company, LLC.

9.      Interlake Material Handling, Inc is the largest manufacturer and supplier

of heavy-duty steel storage rack in North America. Its customers are retailers, mass merchants,

distributors, archive storage providers, healthcare products distributors and third party logistics

providers.  In addition to being the parent company of Conco-Tellus, Inc. and owning 50% of

the equity in NSF Mexicali S. de R.L. de C.V., Interlake is the majority owner of the following

non Debtor entities:  (i) Interlake de Mexico, S.A. de C.V., (ii) Industrias Interlake S.A. de C.V.,

and (iii) Empresas Interlake de Matamoros, S.A. de C.V.  Conco-Tellus, Inc. owns a minority

interest in each of these three entities.

10.     As a consequence of the decline in activity in the residential and commercial construction industry and the decline in economic growth across most sectors of the U.S economy, the Debtors experienced a reduction in business across all market segments.  In addition to the decline in customer orders, increases in commodity prices, particularly steel, had a significant negative impact on the Debtor's profitability during the second half of calendar year 2008.  A subsequent decrease in steel prices (and a corresponding decrease in the value of the Debtors' inventory) led to a tightening of the Debtors' availability under their pre-petition working capital facility.  Combined, these and other events led to the Debtors experiencing operating losses that could not be sustained over an extended period of time without creating liquidity constraints that ultimately would prevent the Debtors from continuing to operate.

11.     The Debtors formulated a plan to consolidate their operations and return to profitability without the need to commence these chapter 11 cases, but they were unable to obtain the capital necessary to implement that plan.

12.     Thereafter, in order to preserve the going concern value of their businesses, the Debtors negotiated an agreement for the sale of a significant portion of their assets.  The Debtors commenced these chapter 11 cases in order to effectuate that sale.

13.     A more detailed description of the Debtors, their business, and the facts and circumstances that caused the Debtors to initiate these chapter 11 bankruptcy cases is included in the background section of the Barry Declaration.

## RELIEF REQUESTED

14.     The Debtors are requesting, pursuant to sections 105, 363, and 365 of the
Bankruptcy Code and Bankruptcy Rules 2002, 6003, 6004, 6006, and 9006, entry of (i) an order
(the "Bid and Sale Procedures Order") substantially in the form attached hereto as **Exhibit A** (a)
setting the time, date, and place of a hearing (the "Sale Hearing") to consider the sale (the
"Sale") of the substantial majority of the Debtors' assets to the Purchaser (as defined below) or
to the qualified bidder with the highest or otherwise best bid at an auction (the "Auction") to be
conducted at a date to be determined by this Court, (b) approving the Bid Procedures (as defined
and described below) for the conduct of the Auction, and (c) approving the Break-Up Fee and
Expense Reimbursement (each as defined below), and (ii) an order substantially in the form
attached hereto as **Exhibit B** (the "Sale Order") approving (a) the Sale to either the purchaser
under that certain Acquisition Agreement (the "Acquisition Agreement") between Mecalux
USA, Inc., a Delaware corporation and Mecalux Mexico S.A. de C.V., a Mexican corporation
(together, the "Purchaser") and the Debtors dated December 31, 2008, a copy of which is
attached hereto as **Exhibit C** or to the qualified bidder with the highest or otherwise best bid at
the Auction (including, possibly, the Purchaser, the "Successful Bidder"), in either case free and
clear of all liens, claims, encumbrances, and other interests, (b) the assumption and assignment
of executory contracts and unexpired leases identified in the Acquisition Agreement or the
purchase agreement of another Successful Bidder, pursuant to section 365 of the Bankruptcy
Code.

15.     Consummation of the Sale is critical in these chapter 11 cases.  The
Debtors do not have the financial wherewithal to continue operations without additional
financing.  Moreover, as set forth in the Debtors' motion seeking approval of debtor-in-

possession financing, the Debtors do not believe that they will be able to secure alternate debtor-in-possession financing over the objection of their existing senior secured lenders.

16.    The Sale to the Purchaser or another Successful Bidder will maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders and, accordingly, is in the best interests of the Debtors, their creditors, and their other economic stakeholders. The Purchaser is a third party, not comprised of insiders of the Debtors, with no affiliation to the Debtors. The relief requested in this Sale and Bid Procedures Motion should be granted.

## DESCRIPTION OF THE PROPOSED SALE AND BIDDING PROCEDURES
### A.  The Acquisition Agreement

17.    Pursuant to the Acquisition Agreement, Purchaser has agreed to purchase, for a purchase price of $30 million, the assets related to Debtors' retail, non-retail, installation services, and IK de Mexico racking business and their Lexington automation controls and integration business, including without limitation inventory, permits, intellectual property and real property related thereto, all as more fully described in Section 1.1 of the Acquisition Agreement.  The Acquired Assets will also include the following wholly owned subsidiaries of the Debtors:  (i) Interlake de Mexico, S.A. de C.V., (ii) Industrieas Interlake S.A. de C.V., (iii) Empresas Interlake de Matamoros, S.A. de C.V., and (iv) NSF Mexicali S. de R.L. de C.V. (collectively, the "Transferred Subs").  In addition, the Debtors will assume and assign to the Purchaser certain of the Debtors executory contracts and unexpired leases related to the other Acquired Assets.

18.    The Acquired Assets do not include the Debtors' non debtor affiliate, J&D Products LLC, cash, accounts receivable and other miscellaneous assets as more fully described in Section 1.2 of the Acquisition Agreement.  The Acquisition Agreement also provides a

mechanism for the Debtors to receive the value of the accounts receivable of the Transferred

Subs net of outstanding liabilities of the Transferred Subs.

19.    Other than liabilities under Assumed Contracts arising after the closing

and other liabilities specifically listed in the Acquisition Agreement, the Purchaser is not

assuming any of the Debtors pre-closing liabilities, as more fully described in Sections 1.3 and

1.4 of the Acquisition Agreement.  Subject to adjustments in the event cure claims exceed $2

million, the Debtors are responsible for paying all cure claims related to the Assumed Contracts.

The Acquisition Agreement also provides for an escrow of $1.35 million of the purchase price

which will be payable to Purchaser in the event of any loss associated with pre-closing liabilities

of the Transferred Subs, Purchaser is held liable for an Excluded Liabilities, or certain other

conditions occur as more fully described in the Acquisition Agreement

20.    The Acquisition Agreement provides bid protections to the Purchaser in

the form of a Break-Up Fee in the amount of $450,000 and Expense Reimbursement up to

$400,000 in the event the Purchaser is not the successful bidder or the transaction fails to close

for other specified reasons not caused by the Purchaser's breach of the Acquisition Agreement

21.    In connection with the Acquisition Agreement, the Purchaser has made a

good faith deposit of $450,000 and the Debtors and the Purchaser has executed a deposit escrow

agreement (the "Deposit Escrow Agreement"), a copy of which is attached hereto as **Exhibit D**.

The Deposit Escrow Agreement sets forth the parameters under which the escrow will be paid to

Purchaser or the Debtors, as applicable.  The Debtors request that the Court approve Debtors'

assumption of the Deposit Escrow Agreement, to the extent the Deposit Escrow Agreement is an

executory contract, in conjunction with the approval of the proposed Bid Procedures (defined

below).

## B.  The Proposed Bid Procedures

22.    While the Debtors believe that the Acquisition Agreement is fair and reasonable, the Debtors believe that the best interests of their estates are served by conducting a public Auction to identify the highest or otherwise best offer for their assets.  Accordingly, the Debtors will seek approval of the Acquisition Agreement with the Purchaser only in the event that the Auction does not yield an offer that is higher or otherwise better than the Acquisition Agreement.  To determine if a higher or otherwise better offer exists, the Debtors seek the Court's approval of the following Bid Procedures (the "Bid Procedures"), which also are attached as **Exhibit 1** to the proposed Bid and Sale Procedures Order.[2]

### BID PROCEDURES

### I.    The Bidding Process

Set forth below is the general process to be employed by the Sellers with respect to the proposed Sale of the Acquired Assets and Interests:

A.    Any person interested in making an offer to purchase the Purchased Assets shall comply with these procedures.

B.    Only Qualifying Bids (as defined below) shall be considered by the Debtors.

C.    If the Debtors do not receive another Qualifying Bid prior to the Bid Deadline (as defined below), then the Purchaser's offer to acquire the Acquired Assets and Interests under the Acquisition Agreement shall constitute the highest or otherwise best Qualifying Bid (the "Successful Bid").

D.    If the Debtors receive another Qualifying Bid prior to the Bid Deadline, then the Debtors shall select a Qualifying Bid as the Successful Bid after the Debtors have conducted an Auction (as defined below) and considered, among other things, the total consideration to be received by their estates as well as other financial and contractual terms relevant to the proposed Sale, including those factors affecting speed and certainty of consummating the proposed Sale.

---

[2]    To the extent the description of the Bid Procedures set forth herein differs from those set forth in Exhibit A to the Bid and Sale Procedures Order, the terms of Exhibit A to the Bid and Sale Procedures Order shall control.

E.     Upon failure to consummate the proposed Sale because of a breach on the part of the Successful Bidder after an order entered at the Sale Hearing, the Debtors shall be permitted to select the next highest or otherwise best bid to be the Successful Bid and to consummate such transaction without further order of the Bankruptcy Court.

F.     If the Successful Bidder (other than the Purchaser) fails to consummate the Sale, and such failure is the result of a breach by the Successful Bidder, such Successful Bidder's Good Faith Deposit shall be forfeited to the Sellers and, except to the extent provided in such bidders' marked agreement, the Sellers specifically reserve the right to seek all available damages from such person.

G.     The Good Faith Deposits of all Qualified Bidders shall be retained by the Sellers and held in escrow in an interest bearing account and all Qualified Bids will remain open, notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of a Successful Bid by a Qualified Bidder, until the earlier of (X) the closing of the sale of the Acquired Assets, and (Y) the date that is 90 days after submission of the Qualified Bid to the Sellers (or such later date specified in the Qualified Bid) (the "Return Date"). On the Return Date, the Sellers shall return the Good Faith Deposits of all Qualified Bidders, except the Successful Bidder, with the accrued interest.

## II.     Participation Requirements

A.     Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the sale process, each person (a "Potential Bidder") shall deliver to the Debtors:

1.     an executed confidentiality agreement in form and substance satisfactory to the Debtors; and

2.     current audited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets and Interests, current audited financial statements or other financial information of the equity holder(s) of the Potential Bidder, or such other form of financial disclosure acceptable to the Debtors, demonstrating such Potential Bidder's ability to close the proposed transaction and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed and assigned.

B.     A "Qualifying Bidder" is (i) the Purchaser and, if applicable, (ii) a Potential Bidder that delivers the documents described in subparagraphs A.1 and A.2 above and that the Debtors determine is reasonably likely (based on the availability of financing, experience and other considerations) to submit a bona fide offer and to be able to consummate the proposed Sale if selected as the Successful Bidder. Two or more Potential Bidders may be deemed a Qualifying Bidder if such Potential Bidders, considered in the aggregate, otherwise meet the foregoing criteria.

C.   The Debtors shall determine whether a Potential Bidder is a Qualifying Bidder and shall provide written notice of their determination to such Potential Bidder and to each then existing Qualifying Bidder.

## III.   Due Diligence

The Debtors may afford each Potential Bidder due diligence access to the Acquired Assets and/or Interests.  The Sellers shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined below).

## IV.   Bid Deadline and Requirements

A.   A "Qualifying Bid" is (i) the Purchaser's offer to acquire the Acquired Assets and Interests pursuant to the Acquisition Agreement and, if applicable, (ii) another Qualifying Bidder's offer to acquire the Acquired Assets and Interests if such offer was received prior to the Bid Deadline and included each of the following (collectively, a "Bid Package"):

1.   An executed copy of an asset purchase agreement (including schedules and exhibits, the "Qualifying Bidder Purchase Agreement") (i) marked to reflect changes to the Acquisition Agreement (ii) irrevocable until the earlier of **thirty (30) days from the date of the Sale Hearing** or two business days after a proposed Sale is consummated (iii) for the purchase of substantially all of the Acquired Assets and Interests, "as is, where is," in exchange for a cash purchase price that  exceeds the  Cash Purchase Price (as such term is defined in the Acquisition Agreement) by at least **$31,850,000** (representing the Expense Reimbursement, Break-Up Fee plus a $1,000,000 increment, the "Minimum Cash Amount") and the assumption or otherwise equivalent value of at least the Assumed Liabilities (as such term is defined in the Acquisition Agreement). Executed copies of two or more asset purchase agreements may be deemed a Qualifying Bidder Purchase Agreement if, considered in the aggregate, such asset purchase agreements otherwise meet the foregoing criteria.

2.   A provision requiring payment of the Break-Up Fee and Expense Reimbursement directly to the Purchaser upon closing of the proposed Sale.

3.   Financial and other information setting forth adequate assurance of future performance under Bankruptcy Code § 365 in a form requested by the Debtors to allow the Debtors to serve such information within one (1) business day after such receipt on counterparties to any executory contracts and unexpired leases being assigned in connection with the proposed transaction that have requested, in writing, such information.

4.    A good faith cash deposit (the "Good Faith Deposit") in the form of a bank or certified check (or other form acceptable to the Debtors in their sole discretion) payable to such party as the Debtors may determine, which Good Faith Deposit shall be held in escrow, in an amount equal to at least 5% of the Cash Purchase Price.

5.    A written statement that the bid is not conditioned on (i) obtaining financing or other financing contingencies or (ii) the outcome of unperformed due diligence by the bidder or any other due diligence contingencies.

B.    A credit bid by the holder of a lien on certain Acquired Assets or Interests shall not be a Qualifying Bid unless such bid also includes provisions for the purchase of the remainder of the Acquired Assets or Interests.

C.    In order to be considered, Bid Packages must be received on or before 4:00 p.m., prevailing eastern time, on **February 13, 2009** (the "Bid Deadline") and, except as may be instructed otherwise with respect to the Good Faith Deposit, should be delivered to:

> Scott Lang
> City Capital Advisors
> 444 North Michigan Avenue, Suite 3200
> Chicago, IL 60611
> Telephone: (312) 494-9808
> Facsimile: (312) 494-9885
> slang@city-cap.com

D.    The Debtors, upon receipt of each Bid Package, shall distribute a copy of such Bid Package to counsel for the Committee and counsel to the Purchaser.

E.    After the Bid Deadline, the Debtors shall determine which Qualifying Bid represents the then highest or otherwise best value to the Debtors (the "Initial Bid"). At least 24 hours prior to the Auction, the Debtors shall distribute copies of the Initial Bid to each Qualifying Bidder.

## V.    Auction

If the Debtors receive a Qualifying Bid other than that of the Purchaser, the Debtors will conduct an Auction. The Auction shall take place at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801on **February 16, 2009 at 10:00 a.m. (ET)** commencing at 10:00 AM prevailing eastern time. Subject to the "Reservation of Rights" set forth below, the Auction shall be governed by the following procedures:

A.    Only a Qualifying Bidder who has submitted a Qualifying Bid (including the Purchaser) shall be eligible to participate at the Auction.

B.    Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the proposed Sale.

C.    The Auction shall begin with the Initial Bid (which, as a Qualifying Bid, will provide for at least the Minimum Cash Amount) and proceed in minimum additional increments of $500,000.

D.    Each bid at the auction must meet each of the criteria of a Qualifying Bid, other than the requirement that it be received prior to the Bid Deadline.

E.    The amount of the Expense Reimbursement and Break-Up Fee will be added to and deemed a part of any bid of the Purchaser.

F.    All bids shall be placed on the record and each bidder shall be informed of the terms of the previous bid.

G.    The Auction shall continue until there is only one offer that the Debtors determine is the Successful Bid. In determining which Qualifying Bid to select as the Successful Bid, the Debtors may consider, among other things, (i) the amount of the purchase price, (ii) the form of consideration being offered, (iii) the likelihood of the Qualifying Bidder's ability to close a transaction and the timing thereof and (iv) the net benefit to the Debtors' estates and their creditors. The Debtors shall present the Successful Bid to the Bankruptcy Court for approval at the Sale Hearing.

H.    The Debtors, in their reasonable discretion, may adopt rules for the Auction at or prior to the Auction that, in their reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures Order; provided, however, that the Debtors may not without the consent of the Purchaser modify (i) the date set for the Auction, (ii) the definition of "Minimum Cash Amount", or the requirements with respect to the Initial Bid in Section V. C; (iii) Sections V. A. or V. E., or (iv) the last sentence of Section V. G.

I.    Subject to the prior consent of the Purchaser, the Debtors, in their reasonable discretion, may adjourn without further notice the Auction (and Sale Hearing) if in their reasonable discretion, an adjournment will better promote the goals of the Auction.

## VI.    Sale Hearing

The Sale Hearing shall take place in the courtroom of the Honorable Kevin J. Carey in the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 on **February 17, 2009 at 11:30 a.m.** prevailing eastern time. With the consent of the Successful Bidder, the Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing or otherwise. At such Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval. Following the Sale Hearing, if such Successful Bidder (other than the

Purchaser) fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Qualifying Bid of the Purchaser shall automatically be deemed to be the Successful Bid and the Debtors shall be authorized to consummate the sale without further order of the Bankruptcy Court.

## VII.    Reservation of Rights

In addition to their rights set forth in section V.H., the Debtors may, with the consent of the Purchaser, modify these Bid Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the proposed Sale of the Acquired Assets and Interests if in their reasonable judgment such modifications would be in the best interest of the Debtors' estates and promote an open and fair sale process, so long as such modifications and/or additional terms are consistent with the provisions of the Acquisition Agreement.

## C. The Proposed Assumption and Assignment Procedures

23.    To facilitate and effect the Sale of the Debtors' assets to the Purchaser, and likely any other Successful Bidder, the Debtors seek authorization to assume and assign certain contracts and unexpired leases in connection with the Sale. The Purchaser has identified contracts and leases of which it requires assignment as part of the Acquisition Agreement and it is likely that any other Successful Bidder will also require the Debtors to assume and assign to it certain executory contracts and unexpired leases in order to realize the maximum going-concern value of the Debtors' business enterprise. In order to provide counterparties with adequate notice of such assumption and proposed adequate cure amounts (the "Cure Amounts"), the Debtors and/or the Successful Bidder propose the following procedures (the "Assumption & Assignment Procedures"), which also are attached as **Exhibit 2** to the proposed Bid and Sale Procedures Order:

A.    Within three business days of approval of the Assumption & Assignment Procedures, the Debtors shall file a schedule of cure obligations (the "Contract & Cure Schedule") listing the Assigned Contracts and the amount, if any, that the Debtors propose to pay to cure such Assigned Contracts pursuant to Bankruptcy Code § 365 (the "Cure Amounts").

B.  Upon filing, a copy of the Contract & Cure Schedule, the Sale Motion and all exhibits related thereto, the Sale Notice, the Bid Procedures Order, the Bid Procedures and these Assumption & Assignment Procedures, will be served on each of the counterparties to the Assigned Contracts listed on the Contract & Cure Schedule.

C.  Any objections ("Assignment Objections") to the assumption and assignment of any Assigned Contract, including, but not limited to, objections relating to adequate assurance of future performance or to the cure amount set forth in the Contract & Cure Schedule must be filed with the Bankruptcy Court and served upon the Notice Parties on or before **February 10, 2009 at 4:00 p.m. (ET)** (the "Assignment Objection Deadline").

D.  Any counterparty failing to file an Assignment Objection by the Assignment Objection Deadline shall be forever barred from (1) objecting to the Cure Amount set forth on the Contract & Cure Schedule with respect to its Assigned Contract; (2) seeking additional amounts arising under its Assigned Contract prior to the Closing from the Debtors, the Purchaser or other Successful Bidder; and (3) objecting to the assumption and assignment of its Assigned Contract to the Purchaser or other Successful Bidder.

E.  Any Assignment Objections not consensually resolved prior to the Sale Hearing shall be heard at the Sale Hearing with any related Cure Amounts or adequate assurance of future performance being fixed by the Bankruptcy Court. All other objections to the proposed assumption and assignment of the Assigned Contracts will be heard at the Sale Hearing.

F.  Except as may otherwise be agreed to by all parties to an Assigned Contract, on or before the Closing, the cure of any defaults under Assigned Contracts necessary to permit assumption and assignment thereof in accordance with Bankruptcy Code § 365(b), shall be by (i) payment of the undisputed Cure Amount, and/ or (ii) establishment of a reserve with respect to any disputed Cure Amount. The party responsible for paying Cure Amounts shall be as set forth in the Acquisition Agreement or, if applicable, in an agreement between the Successful Bidder and the Seller.

24.  The Debtors believe that the proposed Assumption & Assignment

Procedures will provide the counterparties to the Assumed Contracts a full and fair opportunity

to be heard with respect to issues concerning the proposed assumption and assignment of the

Assumed Contracts, whether to the Purchaser or another Successful Bidder.

## LEGAL ARGUMENT

### A. This Court Has The Authority To Approve The Bid Procedures

25.    Courts have indicated that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. *See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

26.    Here, the proposed Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances because they will serve to maximize the value that the Debtors will recover on account of the sale.

### B.  The Bid Procedures Are Appropriate

27.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") quoting *Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Products, Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

28.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g.*, *Integrated Resources*, 147 B.R. at 659 (such procedures "encourage bidding and maximize the value of the debtor's assets"); *In re Financial News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate").

29.    The Debtors believe that the Bid Procedures establish the parameters under which the value of the Debtors' assets may be maximized at the Auction and ensuing Sale Hearing. Such procedures unquestionably will increase the likelihood that the Debtors will receive the greatest possible consideration for such assets because they will ensure a competitive and fair bidding process.

## C. The Initial And Subsequent Overbids Are Appropriate

30.    One important component of the Bid Procedures is the "overbid" provision, pursuant to which any initial offer for the Purchased Assets must be in an amount of at least $1 million more than the $30 million purchase price offered by the Purchaser; plus the amount of the Break-up Fee and Expense Reimbursement. Accordingly, there is an initial approximate 3.33% overbid for the Assets. Indeed, a minimum initial overbid is necessary not only to compensate the Debtors for the risk that they assume in foregoing a known, willing, and able purchaser for a new potential acquirer, but also to ensure that there is an increase in the net proceeds received by the estates, after deducting the Break-Up Fee and Expense Reimbursement to be paid to the Purchaser in the event of a prevailing overbid. Case law also supports minimum overbids that are up to 10% of the initial purchase price as fair and reasonable. As the court stated in *In re Wintex, Inc.*, 158 B.R. 540 (D. Mass. 1992):

> A debtor may avoid the increased costs and complexity associated
> with considering additional bids unless the additional bids are high
> enough to justify their pursuit. The 10% increase requirement is
> one example of a reasonable litmus test.

*Id.* at 543. *See e.g., In re Financial News Network,* 126 B.R. 152, 154 (S.D.N.Y. 1991)

(requiring minimum overbids to exceed purchaser's offer of $105 million by at least $10 million

(9.5%)); *In re Colony Hill Associates,* 111 F.3d 269 (2d Cir. 1997) (requiring minimum overbids

to exceed purchaser's initial offer of $7.5 million by at least $650,000 (8.6%)); *In re Tempo*

*Technology Corp.,* 202 B.R. 363, 369 (D. Del. 1996) (requiring minimum overbids of $1.4

million in cash where original purchase price was $150,000 cash plus $3 million in stock of the

purchaser and $500,000 of assumed liabilities).

31.    Here, the initial overbid amount is approximately 3.33% of the

Purchaser's purchase price; thus, such amount is more than reasonable under the circumstances.

**D. The Break-Up Fee And Expense Reimbursement Are Appropriate**

32.    In order to compensate the Purchaser for the time, effort, expense, and risk

that it has incurred and will incur in negotiating, documenting, and seeking to consummate the

Sale under the Acquisition Agreement, the Bid Procedures also provide that if the Purchaser is

not the Successful Bidder, it will be entitled to a Break-Up Fee of $450,000 and Expense

Reimbursement of $400,000 (collectively the "Bid Protections"). Accordingly, the maximum

aggregate of the Bid Protections equals just over under 3% of the Purchaser's purchase price.

Moreover, approval of the Bid Procedures, including the Bid Protections, is a condition to the

Purchaser going forward with the Sale under the Acquisition Agreement.

33.    Bid Protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the... corporation ha(s) a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize values.

*Integrated Resources*, 147 B.R. at 659-60 (emphasis in original).  Specifically, "breakup fees and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.*, 96 B.R. at 28 (quotations omitted). *See also Integrated Resources*, 147 B.R. at 660-61 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

34.    As a consequence, courts frequently approve bid protections in connection with proposed bankruptcy sales.  Courts considering the propriety of proposed bid protections typically consider "(1) whether the relationship of the parties who negotiated the fee is marked by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the fee is reasonable in relation to the proposed purchase price." *In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Colo. 1992); *accord, In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 552 (Bankr. S.D.N.Y. 1997); *Integrated Resources*, 147 B.R. at 657.

35.    In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit held that although bid protections are measured against a business judgment standard in

non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) apply to bid protections in bankruptcy cases. Accordingly, to the approved, bid protections must provide postpetition benefit to the Debtor's estate. See id. at 533.

36.    The O'Brien Court identified at least two instances in which bid protections may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Section, when the availability of bid protections induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

37.    The proposed Bid Protections are appropriate under the "administrative expense" standard of O'Brien. The Bid Protections are fair and reasonable in amount, particularly in view of the efforts that have been and will be expended by the Purchaser. As reflected in the Acquisition Agreement, the Purchaser requires approval of the Bid Protections as component of this agreement to acquire the Acquired Assets. Moreover, the Bid Protections will enable the Debtors to secure an adequate floor for the Auctions and, thus, insist that competing bids by materially higher or otherwise better than the Purchaser's initial bid, a clear benefit to the Debtors' estates.

38.    In sum, the Debtors' ability to offer the Bid Protections enables them to ensure the sale of the Debtors' assets to a contractually-bound bidder at a price that they believe to be fair while, at the same time, providing them with the potential of even greater benefit to the estates. Thus, the Bid Protections should be approved.

39.     Accordingly, the proposed Break Up Fee is reasonable and appropriate under the circumstances.

**E.  The Auction, Hearing And Notice Procedures Are Appropriate**

40.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with twenty (20) days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), the Debtors are required to notify their creditors of the proposed sale of the Debtors' assets, including a disclosure of the time and place of the Sale Hearing, the terms and conditions of the Sale, and the deadline for filing any objections.

41.     The circumstances require that the Debtors proceed to the Auction and Sale Hearing as expeditiously as applicable law, as the Court's calendar will allow, while still providing the requisite notice of the Sale.

42.     The Debtors propose that within three days following entry of the Bid and Sale Procedures Order, the Debtors will distribute a Notice of Sale of Assets and Auction, a copy of which is attached to the Bid and Sale Procedures Order as **Exhibit 3** (the "Auction Notice"), the Bid and Sale Procedures Order to: (a) counsel to any Committee; (b) the Office of the United States Trustee; (c) counsel to the Debtors' known secured creditors; (d) those parties that request notice of all pleadings in the Debtors' chapter 11 cases pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure; (e) counsel to the Purchaser; and (f) any known prospective bidders at the Auction, including, but not limited to, those parties that have previously signed confidentiality agreements during the process by which the Debtors sought interested bidders for the Assets.  In addition, within three days following entry of the Bid and Sale Procedures Order, the Debtors will serve the Auction Notice by first class mail on all known creditors of the Debtors.

43.     Further, if the Bankruptcy Court believes it is appropriate, the Debtors will publish an abbreviated version of the Auction Notice at least once in the national edition of The Wall Street Journal at least twenty days prior to the Auction. The Debtors contend that such notice of the Auction is good and sufficient notice and that no other or further notice is required.

**F.  The Sale Of The Debtors' Assets To The Successful Bidder Should be Approved**

1.     Ample authority exists for this Court to approve a Sale to the Successful Bidder. Section 363 of the Bankruptcy Code provides, in relevant part, "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(I).  Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor.  See, e.g., *Meyers v. Martin (In re Martin)*, 91 F.3d 289, 295 (3d Cir. 1996), citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991); see also *Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). The Delaware & Hudson Railway court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under McClung and Lionel, observed that

[a] non-exhaustive list of factors to be considered in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value. 124 B.R. at 176.

44.     The business judgment rule shields a debtor's management from judicial second-guessing. *Johns-Manville Corp.*, 60 B.R. at 615-16 ("a presumption of reasonableness attaches to a debtor's management decisions"). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment. . .must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

45.     To sell their property under section 363(b), the Debtors must demonstrate to the Court a "good business reason" for the Auction and Sale. *See Licensing by Paolo, Inc.* v. *Sinatra (In re Gucci)*, 126 F.3d380, 387 (2d. Cir 1997) ("A sale of a substantial part of a [c]hapter 11 estate other than in the ordinary course of business may be conducted if a good

business reason exists to support it."); *Comm. of Equity Sec. Holders* v. *Lionel Corp. (In re*

*Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983) (in considering a sale outside a plan of

reorganization, a judge must not be shackled with unnecessarily rigid rules when exercising the

broad administrative power granted him under the Bankruptcy Code, but must simply find "a

good business reason" supporting the sale ); *In re Global Crossing, Ltd., 295* B.R. 726, 743

(Bankr. S.D.N.Y. 2003).  As this Court has stated, "[w]here the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct."  *Comm. of Asbestos-*

*Related Litigants* v. *Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 616

(Bankr. S.D.N.Y. 1986).  When a valid business justification exists, the law vests the debtor's

decision to use property out of the ordinary course of business with a strong presumption that "in

making a business decision the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company."

*Official Comm. of Subordinated Bondholders* v. *Integrated Res., Inc. (In re Integrated Res.,*

*Inc.),* 147 B.R. 650,656 (S.D.N.Y. 1992) (quoting *Smith* v. *Van Gorkom,* 488 A.2d 858,872 (Del.

1985)).  As stated above, the Debtors do not have the financial wherewithal to continue in

business, have been unable to secure additional financing, and have no option other than to

maximize the value of their assets for the benefit of their creditors and other parties in interest.

The Auction and Sale process set forth herein will allow the Debtors to maximize their value

through a going concern sale, as opposed to recognizing lesser value through a piecemeal sale or

other liquidation strategy.

       46.    As set forth above, the Debtors have determined that the best method of

preserving the Debtors' business as a going concern, or maximizing the distribution to creditors

in a liquidation, would be through a sale of the Acquired Assets.  The fairness and

reasonableness of the consideration to be paid by the Purchaser will be demonstrated by adequate

"market exposure" and an open and fair auction process—the best means for establishing

whether a fair and reasonable price is being paid.  To ensure a fair auction process, the Debtors

will solicit interest from numerous potential purchasers.  Accordingly, the proposed Sale, as well

as the terms of the Acquisition Agreement, should be approved.

**G.  A Sale Free And Clear Of Liens, Claims, Encumbrances, And Interests Is Appropriate**

> 47.     It is appropriate for the Debtors' assets to be sold to the Successful Bidder

free and clear of liens, claims, encumbrances, and interests pursuant to section 363(1)of the

Bankruptcy Code, with any such liens, claims, encumbrances, or interests to attach to the net sale

proceeds of such assets.  *See MacArthur Co.* v. *Johns-Manville Corp., 837* F.2d 89, 94 (2d Cir.

1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of

third-party interests, the third party is adequately protected if his interest is assertable against the

proceeds of the disposition.); *Circus Time, Inc.* v. *Oxford Bank & Trust (In re Circus Time, Inc.),*

5 B.R. 1, 8 (Bankr. D. Me. 1979) (finding the Court's power to sell property free and clear of

liens has long been recognized); *see also In re Riverside Inv. P'ship,* 674 F.2d 634, 640 (7th Cir.

1982) ("Generally, in a 'free and clear' sale, the liens are impressed on the proceeds of the sale

and discharged at the time of sale ....").

> 48.     Any lien, claim, encumbrance, or interest in the Debtors' assets will be

adequately protected by attachment to the net proceeds of the sale, subject to any claims and

defenses the Debtors may possess with respect thereto.  *See In re Circus Time, Inc.,* 5 B.R. at 7.

Moreover, each of the parties that may hold liens on the assets sold could be compelled to accept

a monetary satisfaction of such interests, satisfying section 363(f)(5) of the Bankruptcy Code.

Thus, sale of the Debtors' assets free and clear of liens, claims, encumbrances, and interests will

satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code. Accordingly, the

Debtors' request that their assets be transferred to the Successful Bidder free and clear of all

liens, claims, encumbrances, and interests, with any such liens, claims, encumbrances, and

interests to attach to the net sale proceeds realized from the sale.

**H.  The Assumption And Assignment Of Contracts Satisfies Section 365**

49.    Section 365(a) of the Bankruptcy Code provides that a debtor in

possession "subject to the court's approval may assume or reject any executory contracts or

unexpired leases of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its

sound business judgment in determining to assume an executory contract or unexpired lease,

courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas*

*Assocs. v. Costich (In re Klein Sleep Prods., Inc.),* 78 F.3d 18,25 (2d Cir. 1996); *Orion Pictures*

*Corp.* v. *Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1099 (2d Cir.

1993).

50.    The assumption and assignment of the Contracts to the Purchaser or

another Successful Bidder is in the best interests of the Debtors' estates and a proper exercise of

the Debtors' business judgment. In addition to maximizing the consideration received in

exchange for the Sale, it also allows the Debtors to avoid rejection damages that otherwise would

accrue if those contracts or leases were to be rejected. The Debtors have agreed to pay all

undisputed cure amounts associated with assumption and assignment of the leases and contracts

up to a cap, which are estimated to be approximately $1.4 million under the Acquisition

Agreement.

51.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor in

possession may assign an executory contract or unexpired lease of nonresidential real property if

"adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc.* v. *Arrari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (citation omitted); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

52.    Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

53.    At the Sale Hearing, the Debtors and the Successful Bidder will be prepared to proffer testimony or present evidence to demonstrate the financial credibility, willingness, and ability of Purchaser or other Successful Bidder to perform under the contracts and leases to be assumed and assigned. The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the contracts and leases to be assumed and assigned, as required by section 365(b)(1 )(C) of the Bankruptcy Code. Accordingly, the

Debtors respectfully request that at the conclusion of the Sale Hearing, the Court approve the assumption and assignment of certain contracts and leases, to be effective upon entry of the Sale Order.

54.    Notwithstanding any anti-assignment language in any contract or lease to be assumed and assigned, the Debtors seek permission to assign such agreement, provided that the Debtors first assume the contract or lease and then provide adequate assurance of future performance by the Purchaser or other Successful Bidder.  To facilitate the assumption and assignment of the contracts and leases to be assumed and assigned, the Debtors will request at the Sale Hearing that the Court find any anti-assignment provisions of the contracts and leases to be assumed and assigned to be unenforceable under section 365(f) of the Bankruptcy Code.[3]

55.    Section 365(k) of the Bankruptcy Code provides that assignment by the debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Pursuant to section 365(k), the Debtors and their estates shall be relieved from any liability for any breach of any assumed and assigned lease or contract after such assignment to and assumption by the Successful Bidder upon entry of the Sale Order.

## I.  The Proposed Purchaser Is A Good Faith Purchaser

56.    Section 363(m) of the Bankruptcy Code states:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such

---

[3]    Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease ... "  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) thus provides that a purchaser of property of the estate is

protected from the effects of a reversal on appeal of the authorization to sell such property as

long as the purchaser acted in good faith and the appellant failed to obtain a stay of the sale.

57.    Although the Bankruptcy Code does not define the meaning of "good-faith

purchaser," most courts have adopted a traditional equitable definition: "one who purchases the

assets for value, in good faith and without notice of adverse claims." *See, e.g.. Licensing by*

*Paolo,* 126 F.3d at 390. The Second Circuit has stated that:

> [g]ood faith of a purchaser is shown by the integrity of his conduct
> during the course of the sale proceedings; where there is a lack of
> such integrity, a good faith finding may not be made. A
> purchaser's good faith is lost by 'fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders. '
> *!d.* (internal citations omitted).

58.    The terms and conditions of the Purchase Agreement were negotiated by

the Debtors and Purchaser at arm's length and in good faith.  Each party was represented by

sophisticated counsel.  Accordingly, the Debtors request that the Court determine that the

Purchaser has acted in good faith and is entitled to the protections of a good faith purchaser

under section 363(m) of the Bankruptcy Code.

## J.  Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate

59.    Bankruptcy Rule 6004(h) provides an "order authorizing the use, sale, or

lease of property is stayed until the expiration of 10 days after entry of the order, unless the court

orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) further provides that an

"order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is

stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d). In light of the Debtors limited liquidity and their corresponding need to consummate the sale, the order approving the sale of the Purchased Assets, if granted, and the assumption and assignment of the Assumed Contracts to the Purchaser in accordance with this Motion must be effective immediately upon entry of such order.

## NOTICE

60.    Notice of this Motion has been given to: (i) the United States Trustee; (ii) counsel to National City Business Credit, Inc.; (iii) counsel to Roynat Business Capital, Inc.; (iv) counsel to the Purchaser; (v) all parties known or reasonably believed to have asserted an Encumbrance on any of the Acquired Assets and/or Interests; (vi) the counterparties to each of the Assigned Contracts; (vii) all persons or entities known or reasonably believed to have expressed an interest in acquiring the Acquired Assets and/or Interests; (viii) all taxing authorities having jurisdiction over any of the Acquired Assets; (ix) the Attorneys General in the States where the Acquired Assets and Interests are located; (x) the United States Environmental Protection Agency and comparable State agencies where the Acquired Assets are located; (xi) the Debtors' thirty largest creditors; and (xii) all parties that have requested personal notice pursuant to Bankruptcy Rule 2002   In light of the nature of the relief requested, the Debtors submit that no further notice is required.

WHEREFORE, the Debtors respectfully request (A) entry of the Bid and Sale Procedures Order, substantially in the form attached hereto as Exhibit A, (B) entry of Sale Order substantially in the form attached hereto as Exhibit B, and (C) such other and further relief as the Court deems just and proper.

Dated:    January 6, 2009

YOUNG CONAWAY STARGATT & TAYLOR, LLP

M. Blake Cleary (No. 3614)
Edward J. Kosmowski (No. 3849)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

WINSTON & STRAWN LLP
Daniel J. McGuire
Jeremy T. Stillings
Myja K. Kjaer
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

Proposed Counsel for Debtors