**EXECUTION VERSION**

# ASSET PURCHASE AGREEMENT

## BY AND AMONG

## J & D COMPANY, LLC

## IDENTIFIED AS SELLER HEREIN,

## AND

## INTERLAKE MECALUX, INC.

## DATED AS OF JUNE 23, 2009

CHI:2275543.2

# TABLE OF CONTENTS

**Page**

ARTICLE I      DEFINITIONS..................................................................................1
   1.1    Certain Definitions...................................................................1
   1.2    Terms Defined Elsewhere in this Agreement ...........................6
   1.3    Other Definitional and Interpretive Matters. ...........................7

ARTICLE II     PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES.....9
   2.1    Purchase and Sale of Assets.....................................................9
   2.2    Excluded Assets.....................................................................10
   2.3    Assumption of Liabilities.......................................................11
   2.4    Excluded Liabilities ...............................................................11
   2.5    Purchased Contracts...............................................................12
   2.6    Non-Assignment of Assets ....................................................13
   2.7    Further Conveyances and Assumptions...................................13

ARTICLE III    CONSIDERATION; ADJUSTMENT..............................................14
   3.1    Deposit ...................................................................................14
   3.2    Purchase Price. .......................................................................14

ARTICLE IV    CLOSING AND TERMINATION.................................................16
   4.1    Closing Date...........................................................................16
   4.2    Deliveries by Seller................................................................16
   4.3    Deliveries by Purchaser .........................................................17
   4.4    Termination of Agreement......................................................17
   4.5    Procedure Upon Termination..................................................18
   4.6    Effect of Termination.............................................................18

ARTICLE V     REPRESENTATIONS AND WARRANTIES OF SELLER............................19
   5.1    Organization and Good Standing............................................19
   5.2    Authorization of Agreement ...................................................19
   5.3    Conflicts; Consents of Third Parties. .....................................19
   5.4    Absence of Changes................................................................20
   5.5    Purchased Assets....................................................................20
   5.6    Taxes......................................................................................20
   5.7    Intellectual Property...............................................................21
   5.8    Employee Benefits..................................................................21
   5.9    Litigation................................................................................22
   5.10   Brokers...................................................................................22
   5.11   Contracts. ...............................................................................22
   5.12   Labor and Employment Matters .............................................23
   5.13   Environmental and Safety Requirements................................23
   5.14   Compliance with Laws; Permits ............................................23
   5.15   Customers and Suppliers........................................................23

i

5.16    Affiliate Transactions...................................................................................................24
5.17    Financial Statements ....................................................................................................24
5.18    Proper Notice ...............................................................................................................24
5.19    "AS IS" TRANSACTION .............................................................................................24

ARTICLE VI    REPRESENTATIONS AND WARRANTIES OF PURCHASER....................24
6.1    Organization and Good Standing...................................................................................24
6.2    Authorization of Agreement ........................................................................................25
6.3    Conflicts; Consents of Third Parties.............................................................................25
6.4    Financing.......................................................................................................................25

ARTICLE VII    BANKRUPTCY COURT MATTERS ............................................................26
7.1    Competing Transaction..................................................................................................26
7.2    Bidding Procedures........................................................................................................26
7.3    Sale Order .....................................................................................................................26

ARTICLE VIII    COVENANTS ...............................................................................................26
8.1    Access to Information.....................................................................................................26
8.2    Conduct Pending the Closing.........................................................................................26
8.3    Consents.........................................................................................................................28
8.4    Further Assurances.........................................................................................................28
8.5    Preservation of Records .................................................................................................28
8.6    Publicity; Termination of NDA .....................................................................................28
8.7    Collection of Receivables ..............................................................................................29
8.8    Employee Bonuses.........................................................................................................29
8.9    Third Party Contact by Purchaser ..................................................................................29
8.10    Transition Services Agreement.....................................................................................29
8.11    Terms of Appointment of Escrow Agent......................................................................29

ARTICLE IX    EMPLOYEES AND EMPLOYEE BENEFITS .................................................30
9.1    Hired Employees............................................................................................................30
9.2    Employment Tax Reporting............................................................................................31
9.3    No Obligations ...............................................................................................................31
9.4    No Third Party Beneficiary ............................................................................................31

ARTICLE X    CONDITIONS TO CLOSING ............................................................................31
10.1    Conditions Precedent to Obligations of Purchaser ......................................................31
10.2    Conditions Precedent to Obligations of Seller.............................................................32
10.3    Conditions Precedent to Obligations of Purchaser and Seller .....................................32
10.4    Frustration of Closing Conditions................................................................................32

ARTICLE XI    MISCELLANEOUS ..........................................................................................32
11.1    No Survival of Representations and Warranties............................................................32
11.2    Expenses ......................................................................................................................33
11.3    Injunctive Relief...........................................................................................................33
11.4    Submission to Jurisdiction; Consent to Service of Process. ........................................33
11.5    Waiver of Right to Trial by Jury...................................................................................34

| | | |
|---|---|---|
| 11.6 | Entire Agreement; Amendments and Waivers | 34 |
| 11.7 | Governing Law | 34 |
| 11.8 | Notices | 34 |
| 11.9 | Severability | 35 |
| 11.10 | Assignment | 36 |
| 11.11 | Counterparts; Electronic Delivery | 36 |
| 11.12 | Cooperation and Audits | 36 |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of June __, 2009 (this "Agreement") is entered into by and among Interlake Mecalux, Inc., a Delaware corporation ("Purchaser"), and J & D Company, LLC, a Delaware limited liability company ("Seller").

### WITNESSETH:

WHEREAS, Seller has filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, upon the terms and subject to the conditions set forth herein and as authorized under Sections 105, 363, and 365 of the Bankruptcy Code, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, substantially all of Seller's assets used in the Business in exchange for the payment to Seller of the Purchase Price;

WHEREAS, the Board of Managers of Seller believes, following consultation with its financial advisors and reasonable due diligence, that, in light of the current circumstances, a sale of the Business is necessary to maximize value and is in the best interest of Seller and its equity holders and creditors; and

WHEREAS, the transactions contemplated by this Agreement (the "Transactions") are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to this Agreement and a Sale Order (as defined below) to be entered in the Bankruptcy Case and other applicable provisions of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, and intending to be bound hereby, the parties hereby agree as follows:

### ARTICLE I

### DEFINITIONS

1.1    Certain Definitions.  For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1 or in other Sections of this Agreement, as identified in the chart in Section 1.2:

"503(b)(9) Claims" means all allowed claims in the Bankruptcy Case pursuant to Section 503(b)(9) of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Bankruptcy Case" means the bankruptcy case arising from the filing under Chapter 11 of the Bankruptcy Code referenced in the initial Recital.

"Bid Deadline" means the date established by the Bankruptcy Court by which all bids from potential purchasers must be received by the Bankruptcy Court.

"Bidding Procedures" means the Bidding Procedures established for the solicitation of competing bids for the Purchased Assets, in the form set forth in the Bidding Procedures Order.

"Bidding Procedures Order" means that certain Order (A) Approving Bid Procedures For The Sale Of A Portion Of J&Ds Assets, (B) Scheduling The Auction, (C) Authorizing Payment Of The Break-Up Fee, (D) Approving The Deposit, (E) Scheduling The Sale Hearing, (F) Approving The Assumption And Assignment Procedures Related To The Sale And (G) Approving The Form Of The Sale Notice [Docket No. 513] entered in the Bankruptcy Cases on May 27, 2009.

"Business" means the business of Seller conducted through its service operations identified as either "J&D Associates" or "Retail Service Solutions" and which includes, without limitation, aftermarket carousel and electromechanical maintenance and service, lighting maintenance and retrofits, fixture installation and renovation, project renovations and safety upgrades and all associated equipment and systems in support of such service operations; provided, however, in no event shall "Business" include the manufacturing operations of Seller and the installation business related thereto.

"Business Day" means any day of the year on which national banking institutions in Chicago, Illinois are open to the public for conducting business and are not required or authorized to close.

"Business Name" means "Retail Service Solutions," either alone or in combination with other words, graphics or designs, including all rights in said term as a trade name, trade mark, corporate name, service mark and domain name, and any confusingly similar variation, derivative or translation thereof.

"COBRA" means Section 4980B of the Code.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any written contract, indenture, note, bond, lease, license, purchase order, sales order or other agreement.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, surveys, vendor lists, customer lists, regulatory filings, operating data and plans, technical documentation (design and performance specifications, diagrams, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes,

working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Employee Benefit Plans" means (i) all "employee benefit plans," as defined in Section 3(3) of ERISA, (ii) all employment, consulting or other individual compensation agreements, and (iii) all bonus or other incentive, equity or equity-based compensation, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical, life insurance, scholarship programs or other benefit plans or arrangements as to which Seller or any ERISA Affiliate has any obligation or liability, contingent or otherwise.

"Employees" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by Seller in connection with the Business; together with individuals who are hired in respect of the Business after the date hereof and prior to Closing.

"Environmental and Safety Requirements" means all Laws relating to pollution, protection of the environment, or protection of human health or safety from hazardous substances or environmental hazards.

"Equipment" means any and all equipment, furniture, furnishings, fixtures, office supplies, vehicles, desks, chairs, tables, Hardware, and all other fixed assets.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any organization which is, or was (at a relevant time), a member of a controlled group of organizations with Seller within the meaning of Sections 414(b), (c), (m), or (o) of the Code, or which would be considered to be a single employer with Seller pursuant to Section 4001(b) of ERISA.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired, and no such appeal, motion or petition is pending.

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, and all telephones and telephone-related hardware, including, but not limited to, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Intellectual Property" means all intellectual property arising from or in respect of the following: (i) all patents and applications therefor, including continuations,

divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, internet domain names and corporate names and general intangibles of a like nature, including the Business Name, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (iii) copyrights and registrations and applications therefor and works of authorship, and mask work rights, (iv) all Software, (v) confidential information, know-how, trade secrets and inventions, (vi) those telephone numbers listed on Schedule 2.1(b)(v), and (vii) all other intellectual property.

"Inventory" means any and all inventory, supplies, finished goods and goods-in-transit to Seller.

"Knowledge of Seller" means the actual knowledge, after reasonable inquiry, of those individuals identified on Schedule 1.1(c).

"Law" means any federal, state, provincial, local, municipal, foreign international, multinational or other law, statute, code, constitution, treaty, ordinance, Order, rule or regulation.

"Legal Proceeding" means any action, suit, litigation, investigation, hearing, proceeding or claim (whether public or private and whether civil, criminal, administrative or arbitral) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body.

"Liability" or "Liabilities" means any and all debts, liabilities or obligations of any type or description (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal or first offer, easement, servitude, restrictive covenant, encroachment, hypothecation, debt, levy, indenture, proxy, voting trust or agreement, transfer restriction or encumbrance or any other similar restriction of any kind.

"Local Time" means the prevailing local time in the State of Delaware.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Permits" means any approvals, authorizations, consents, licenses, permits, grants, clearances, orders or certificates of a Governmental Body.

"Permitted Exceptions" means (i) all defects, exceptions, restrictions, easements, rights of way and encumbrances of record that would be disclosed by a current title report or a current ALTA survey that do not, individually or in the aggregate, in any material respect detract from the value of or interfere with the present use of the property subject

thereto; and (ii) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Petition Date" means May 20, 2009, being the date on which the Bankruptcy Case was filed.

"Sale Order" shall mean an order of the Bankruptcy Court substantially in the form attached hereto as Exhibit A, approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the Transaction, and providing, among other things, that (i) good and marketable title to the Purchased Assets sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens (other than Liens created by Purchaser and other than Permitted Exceptions) and claims, such Liens and claims to attach to the Purchase Price, and specifically including the transfer of any avoidance claims included in the Purchased Assets; (ii) Purchaser shall have no Liability with respect to the Purchased Assets, the Business, or otherwise, except for the Assumed Liabilities as expressly set forth in this Agreement; (iii) Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (iv) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (v) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof, as provided in Section 11.4 hereof; (vi) cause exists to waive the automatic stay imposed by Bankruptcy Rule 6004(h); and (vii) this Agreement and the Transactions may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Seller or any Chapter 7 or Chapter 11 trustee of Seller. In addition, the Sale Order shall approve and authorize the assumption and assignment of all of the Purchased Contracts such that the Purchased Contracts will be in full force and effect from and after the Closing with non-Seller parties being barred and enjoined from asserting against Purchaser, among other things, defaults, breaches or claims existing as of the Closing or by reason of the Closing.

"Seller Material Adverse Effect" means, other than the filing of the Bankruptcy Case, any event, circumstance, state of facts, change, violation, inaccuracy or occurrence which has had or would reasonably be expected to have, individually or when considered together with any other events, circumstances, facts, changes, violations, inaccuracies or occurrences, (i) a material adverse effect on, or a material adverse change in, the Purchased Assets or the Business or which has materially adversely changed the overall earnings potential of the Business, or (ii) a material adverse effect on, or a material adverse change in or to, the ability of Seller to consummate the Transactions or perform its obligations under this Agreement; provided, a "Seller Material Adverse Effect" shall not include the effects arising solely from the consequences of (a) any change in Law of any Governmental Body that applies generally to similarly situated Persons, (b) the filing of the Bankruptcy Case (other than actions by customers of the Business in response

thereto), (c) events or changes that are consequences of terrorist activity, acts of war or acts of public enemies, (d) the negotiation, announcement, execution, delivery, consummation or anticipation of the transactions contemplated by, or in compliance with, this Agreement but only insofar as any such change or development results solely from the identity of the Purchaser, or (e) the terms and conditions of employment offered by the Purchaser to any Employee.

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (iv) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (v) all documentation including user manuals and other training documentation related to any of the foregoing.

"Tax Authority" means any Governmental Body charged with the administration of any Law relating to Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges, duties, customs, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, escheat and estimated taxes and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any of the foregoing.

"Tax Return" means any returns, declarations, reports, estimates, information returns and statements in respect of any Taxes (including any attachments thereto or amendments thereof) filed with any Tax Authority.

"Termination Date" means June 29, 2009.

"WARN Act" means the Worker Adjustment and Retraining Notification Act and any similar foreign, state or local Law.

"Working Capital" means (i) (accounts receivable included in the Purchased Assets less a reserve for doubtful accounts as calculated pursuant to Exhibit B hereto) plus (Purchased Inventory less a reserve for obsolete or slow moving items as calculated pursuant to Exhibit B hereto) as of the Closing Date, minus (ii) the actual outstanding amount of Current Trade Liabilities included in the Assumed Liabilities as of the Closing Date. Solely for purposes of this definition, Purchased Inventory shall only include items for which the purchase price has been fully paid by Seller and Purchased Inventory shall be valued at the lower of cost or market. In no event will the reserve for obsolete or slow moving Inventory exceed $100,000.

1.2    Terms Defined Elsewhere in this Agreement. For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
|------|---------|
| Agreement | Preamble |
| Allocation Statement | 3.2(d) |
| Assigned Permits | 2.1(b)(vii) |
| Assignment and Assumption Agreement | 4.2(b) |
| Assumed Liabilities | 2.3 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bill of Sale | 4.2(a) |
| Break-Up Fee | 7.2(c) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Competing Transaction | 7.1 |
| Current Trade Liabilities | 2.3 |
| Deposit | 3.1 |
| Electronic Delivery | 11.11 |
| Escrow Agent | 3.1 |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Exclusivity Period | 7.1 |
| Hired Employees | 9.1 |
| Lease | 4.2(e) |
| Material Contract | 5.11(a) |
| Material Customers | 5.15 |
| Material Suppliers | 5.15 |
| Necessary Consent | 2.6 |
| Purchased Assets | 2.1(b) |
| Purchased Contracts | 2.1(b)(iii) |
| Purchased Intellectual Property | 2.1(b)(v) |
| Purchased Inventory | 2.1(b)(ii) |
| Purchase Price | 3.2(a) |
| Purchaser | Preamble |
| Purchaser's Representatives | 8.1 |
| Seller | Preamble |
| Transactions | Recitals |

1.3    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided in this Agreement, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    Time of the Essence Calculation of Time Period.    Each party hereto acknowledges and agrees that time is of the essence for each and every provision of this Agreement and that the breach of any provision hereof requiring any act to be done or step to be taken within a certain period or prior to a certain

date or time shall be deemed a material breach of this Agreement. When calculating the period of time before which, within which or following which any act is to be done or taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)   Dollars. Any reference in this Agreement to $ means U.S. dollars.

(iii)   Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)   Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)   Headings. The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)   Herein. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)   Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(viii)   Ordinary Course. The term "ordinary course of business" with respect to Seller shall mean the ordinary course of business of Seller (and its predecessors) in accordance with its conduct prior to the Petition Date but taking into effect the Seller's compliance with applicable bankruptcy Laws.

(b)   The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    <u>Purchase and Sale of Assets</u>.

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, convey, assign and deliver to Purchaser, good and marketable title and all of Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens other than the Permitted Exceptions, and without any Liability other than the Assumed Liabilities.

(b)    For all purposes of and under this Agreement, the term "<u>Purchased Assets</u>" means all of the property, assets and rights of Seller (other than the Excluded Assets) existing as of the Closing, of any kind or nature, real or personal, tangible or intangible in each case to the extent primarily used in, or primarily related to the operation of, the Business or as otherwise specifically identified in the schedules hereto, including the following:

(i)    all accounts, notes and other receivables, security deposits and prepaid expenses;

(ii)    all Inventory (whether owned by, in-transit to, or on order to be delivered to, Seller), including without limitation, the Inventory shown in the Seller's perpetual inventory software module maintained in the Seller's electronic records (collectively, the "<u>Purchased Inventory</u>");

(iii)    those Contracts which are listed on <u>Schedule 2.1(b)(iii)</u> hereto and indicated on such Schedule as Contracts to be assumed by Purchaser, as may be updated by Purchaser as indicated on such Schedule, (the "<u>Purchased Contracts</u>");

(iv)    all Equipment (whether owned by, in the possession of, in-transit to, or on order to be delivered to, Seller), including without limitation, the Equipment set forth on <u>Schedule 2.1(b)(iv)</u>;

(v)    all Intellectual Property, all rights to sue and recover for past, present and future infringements, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including any Intellectual Property licensed to Seller and including the Intellectual Property listed on <u>Schedule 2.1(b)(v)</u> hereto, (the "<u>Purchased Intellectual Property</u>");

(vi)    all Documents that are used in, held for use in or intended to be used in, or that relate to, the Purchased Assets, the Assumed Liabilities or the Business or operation of the Business, including Documents relating to products of the Business, services, marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Hired Employees and all files,

customer files and documents (including credit information), supplier lists and files, records, literature and correspondence, whether or not physically located on any of the premises subject to this Agreement, but excluding any Documents related primarily to an Excluded Asset;

(vii)    all Permits to the extent assignable (the "Assigned Permits");

(viii)    any rights, claims, defenses, counterclaims, cross-claims or causes of action of whether arising out of events occurring prior to, on or after the Closing Date, including any rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors;

(ix)    all goodwill and other intangible assets, including all goodwill associated with the Business Name and the other Purchased Intellectual Property;

(x)    all supplies owned by Seller;

(xi)    to the extent in the possession of Seller, any copies (but not originals) of engineering drawings and parts lists, including vendor names and pricing for all parts manufactured and/or provided at any time to the Business by Seller's manufacturing division;

(xii)    all rights of Seller under non-disclosure or confidentiality agreements and invention assignment agreements with Employees, contractors, and agents of Seller or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(xiii)    all claims, demands, actions or causes of action whatsoever against any of the Persons listed on Schedule 2.3 hereto, including all avoidance and preference claims, actions and rights, and all rights, claims, duties or powers of Seller pursuant to Chapter 5 of the Bankruptcy Code and any proceeds thereof; and

(xiv)    all other tangible or intangible assets.

The parties agree that any dispute between the Purchaser and the Seller concerning whether a fixed asset located at the Seller's Pennsylvania office and which is not listed on the Schedules hereto is part of the Purchased Assets as provided in this Section 2.1, shall be resolved by Daniel P. Wikel (or in the event of the death, disability or termination of Daniel P. Wikel, such other appropriate representative of Huron Consulting Group, LLC), in good faith.

2.2    Excluded Assets.    Notwithstanding Section 2.1 above, nothing herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under the Excluded Assets. For all purposes of and under this Agreement, the term "Excluded Assets" means:

(a)    all cash and cash equivalents, including cash in transit and marketable securities, utility deposits required to be made by Seller in connection with the filing of

the Bankruptcy Case, bank accounts, prepaid insurance expenses and retainers paid to professional advisors;

(b)     all Tax refunds and credits relating to the Purchased Assets, the Business and the Hired Employees for all periods (or portions thereof) ending on or before the Closing Date and any Tax refunds, credits and other Tax attributes of the Seller;

(c)     any minute books, stock ledgers, corporate seals, stock certificates and other similar records which, by law, Seller is required to retain in its possession;

(d)     all Contracts (other than the Purchased Contracts);

(e)     those assets (including those assets used in the Seller's manufacturing division, i.e., J&D Associates), which are not primarily used or held for use in the conduct or operation of the Business, except for any assets listed on Schedules 2.1(b)(iii)(iv) and (v);

(f)     any and all rights, claims, duties or powers of Seller pursuant to Chapter 5 of the Bankruptcy Code and any proceeds thereof, except as provided in Section 2.1(b)(xiii);

(g)     all insurance policies; and

(h)     all rights of Seller under this Agreement.

2.3     Assumption of Liabilities.   On the terms and subject to the conditions and limitations set forth in this Agreement, at the Closing Purchaser shall assume, effective as of the Closing, only (i) those obligations of Seller pursuant to the terms and conditions set forth in the Purchased Contracts which arise after the Closing Date, and (ii) those trade payables of the Seller which are set forth on Schedule 2.3 hereto and which are specifically designated on such Schedule 2.3 as a payable which Purchaser has agreed to assume, in the amount owed to such creditor as of the Petition Date, provided that for clarity, notwithstanding anything to the contrary herein, the parties acknowledge that no payments owed by Seller under the Purchased Contracts are considered a part of the Current Trade Liabilities, (the "Current Trade Liabilities"), which Schedule 2.3 shall be updated as of the Closing Date (x) to reflect trade payables and amounts paid by Seller as provided in Section 3.2(b) hereof, if any, and (y) to reflect the addition of any trade payables, if any, owed as of the Petition Date which Purchaser has noted on Schedule 2.3 as reserved and which Purchaser shall have agreed, in its sole discretion, to assume as of the Petition Date, and (z) to reflect the addition of any trade payables of the Business which are incurred after the Petition Date and which remain unpaid as of the Closing Date which the Purchaser shall have agreed, in its sole discretion, to assume, (the "Post Petition Payables") (collectively, the "Assumed Liabilities"), and no other Liabilities whatsoever.

2.4     Excluded Liabilities.   For the avoidance of doubt, Purchaser shall not assume and shall be deemed not to have assumed, and Seller shall be solely and exclusively liable with respect to, any and all Liabilities of Seller other than the Assumed Liabilities (collectively, the "Excluded Liabilities").   For the avoidance of doubt, the Excluded Liabilities include, and the Assumed Liabilities do not include, the following:

(a)    all Liabilities of Seller existing prior to and after the Petition Date, other than the Assumed Liabilities;

(b)    all Liabilities for Taxes due or payable by Seller for any tax period (or portion thereof);

(c)    all Liabilities of Seller in respect of any current or former employees of Seller; provided, that in no event shall Seller have any Liability with respect to any violation of Law by Purchaser occurring in connection with the hiring of any such employees;

(d)    all 503(b)(9) Claims;

(e)    all Liabilities under or relating to the Employee Benefit Plans;

(f)    all Liabilities of Seller under this Agreement, including Liabilities relating to amounts required to be paid by Seller hereunder;

(g)    all transfer taxes applicable to the transfer of the Purchased Assets;

(h)    all Liabilities under or relating to any reclamation or similar claim;

(i)    any Liability relating to or arising out of any violation of Law by, or any Legal Proceeding against, Seller or any breach, default or violation by Seller of or under any Purchased Contract or the operation of the Business by Seller; and

(j)    all trade payables and all other Liabilities of the Seller, other than the Assumed Liabilities.

2.5    Purchased Contracts.

(a)    From and after the date hereof until the Closing, Seller shall not enter into, assume or reject or seek to assume or reject any Contract relating to the Business or the Purchased Assets without the prior written approval of Purchaser. Seller shall provide timely and proper notice of the motion seeking entry of the Sale Order to all parties to Purchased Contracts and, subject to Section 2.6, Seller shall use commercially reasonable efforts to cause such Purchased Contracts to be assumed by Seller pursuant to Section 365 of the Bankruptcy Code.

(b)    At Closing and pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Purchaser and Purchaser shall assume from Seller, the Purchased Contracts (only to the extent of the Assumed Liabilities). All cure amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts shall be paid by Seller on or before Closing, and not by Purchaser, and Purchaser shall have no liability therefor. For purposes of clarity, the parties hereto agree that the foregoing cure amounts to be paid by Seller do not, and shall not, include any amounts owed in connection with the Current Trade Liabilities. Purchaser shall

assume all Current Trade Liabilities and pay all cure amounts owed in connection with any such Current Trade Liabilities.

2.6    Non-Assignment of Assets.    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Purchased Contract if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any party thereto other than Seller (each such action, a "Necessary Consent"), would constitute a breach thereof (after giving effect to any elimination of such approval, authorization or consent requirement by operation of the Sale Order) or in any way adversely affect the rights or obligations of Purchaser thereunder and such Necessary Consent is not obtained and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required.    In such event, Seller and Purchaser will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Contract or any claim or right or any benefit arising thereunder for the assignment thereof to Purchaser as Purchaser may reasonably request.    If such Necessary Consent is not obtained, or if such Purchased Contract or an attempted assignment thereof would otherwise be ineffective or would adversely affect the rights of Seller thereunder so that Purchaser would not in fact receive all such rights, Seller and Purchaser will cooperate in a mutually agreeable arrangement, to the extent feasible, under which Purchaser would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Liabilities hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Purchaser, or under which Seller would enforce for the benefit of, and at the direction of, Purchaser, with Purchaser assuming Seller's obligations (to the extent otherwise constituting Assumed Liabilities hereunder), any and all rights of Seller thereunder.

2.7    Further Conveyances and Assumptions.

(a)    Subject to applicable Law, Seller shall deliver to Purchaser at the Closing personnel records of Hired Employees as is reasonably necessary for Purchaser to transition such Hired Employees into Purchaser's records and all other Documents included in the Purchased Assets.

(b)    At the Closing, and from time to time following the Closing, Seller and Purchaser shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to sell, transfer, convey, assign and deliver fully to Purchaser and its respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to Seller and its successors and permitted assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective or evidence the Transactions.

ARTICLE III

CONSIDERATION; ADJUSTMENT

3.1     Deposit.  The parties acknowledge that Purchaser has deposited the sum of One Hundred Twenty-Five Thousand Dollars ($125,000) (the "Deposit") into an escrow account maintained by City Capital Advisors, LLC (the "Escrow Agent").  The Deposit shall be released from escrow and either (i) paid to Seller at Closing as part of the Purchase Price as set forth in Section 3.2; or (ii) returned to Purchaser upon termination of this Agreement for any reason, with the sole exception of a termination by Seller for the reasons set forth in and in accordance with Section 4.4(k).  In the event that this Agreement is terminated by Seller solely for the reasons set forth in Section 4.4(k), then the Deposit shall be paid to the Seller as liquidated damages and as Seller's sole and exclusive remedy for any breach of this Agreement by the Purchaser, and neither Purchaser nor any of its employees, affiliates, managers or members shall have any further liability or obligation to the Seller whatsoever.

3.2     Purchase Price.

(a)     Cash Purchase Price.  The purchase price for the Purchased Assets (the "Purchase Price") shall be an amount in cash equal to One Million Two Hundred Seventy-Five Thousand Dollars ($1,275,000) adjusted as set forth in Sections 3.2(b) and (c) below.  An example of the calculation of the Purchase Price pursuant to the provisions of this ARTICLE III is set forth on Exhibit C hereto. At the Closing, (i) an amount equal to (x) the Estimated Closing Purchase Price (as defined in Section 3.3 below) minus (y) $450,000 shall be paid by Purchaser to Seller in immediately available funds, including the release of the Deposit, and (ii) an amount equal to $450,000 shall be delivered to the Escrow Agent (the "Working Capital Escrow Amount") to be held and paid to the Purchaser or Seller in accordance with the terms set forth in Section 3.5 hereof.

(b)     Adjustments for Trade Liabilities.  The Purchase Price (i) shall be increased by an amount equal to the sum of (A) $30,000 plus (B) the aggregate amount of all payments made by Seller during the period commencing on the Petition Date and expiring on the Closing Date in satisfaction of any Current Trade Liability (or portion thereof) existing as of the Petition Date; and (ii) shall be decreased by an amount equal to the aggregate of all Post Petition Payables assumed by the Purchaser pursuant to Section 2.3(ii)(z) hereof.

(c)     Working Capital Adjustment.  The Purchase Price shall be (i) reduced by an amount equal to the dollar amount, if any, that the Seller's Working Capital as of the Closing is less than the sum of (A) Seven Hundred Thousand Dollars ($700,000) plus (B) the amount that the Purchase Price is increased pursuant to Section 3.2(b)(i) (such resulting amount being referred to herein as the "Threshold") or (ii) increased by an amount equal to the dollar amount, if any, that Seller's Working Capital as of the Closing exceeds the Threshold.

(d)     Purchase Price Allocation.  On the Closing Date, Seller and Purchaser shall jointly allocate the Purchase Price among the Purchased Assets in accordance with

the statement (the "Allocation Statement") set forth on Schedule 3.2(d) hereto, in accordance with Section 1060 of the Code. Purchaser and Seller shall file all Tax Returns (including Form 8594) on a basis that is consistent with the Allocation Statement, and shall take no position inconsistent therewith for Tax purposes unless required by an administrative or judicial determination.

3.3    Closing Date Calculations.    Prior to Closing, Seller shall deliver to Purchaser a statement containing a good faith estimate of (i) the Working Capital as of the Closing, calculated using the methodology set forth on Exhibit B hereto and (ii) calculation of the Purchase Price as adjusted pursuant to Section 3.2(b) and Section 3.2(c) (the "Estimated Closing Purchase Price").

3.4    Final Purchase Price Calculation.    The final Purchase Price shall be calculated as follows:

(a)    No later than twenty-five (25) days after the Closing Date, Purchaser shall deliver to Seller a statement containing Purchaser's calculation of (i) the Working Capital as of the Closing, calculated using the methodology set forth on Exhibit B hereto, (ii) the adjustments to the Purchase Price pursuant to Section 3.2(b), and (iii) a calculation of the Purchase Price based on such calculations.

(b)    The calculation of the Purchase Price shall be binding upon Seller, unless Seller gives written notice to Purchaser within twenty (20) days after receipt thereof of its disagreement with any of the values or amounts shown on such calculations (the "Dispute Notice"). In the event Purchaser and Seller are unable to resolve any such disagreement within ten (10) days after the date of the Dispute Notice, the disagreement shall be submitted to an independent accounting firm with nationally recognized standing mutually agreed to by Seller and Purchaser (the "Arbitrator") for resolution. If any amount included in the calculation of the Purchase Price is determined to be erroneous, the correct amount shall be inserted in lieu thereof and the Purchase Price shall be recalculated to give effect to such changes. The calculation of the Purchase Price, as so corrected, shall constitute the "Final Purchase Price" for purposes of this Agreement. The fees and expenses of the Arbitrator shall be split evenly between Seller and Purchaser.

3.5    Payments on Account of Purchase Price Adjustments.    Within five (5) Business Days following (i) the expiration of the twenty-day period for giving the Dispute Notice if no Dispute Notice is given, or (ii) final resolution (in accordance with Section 3.4(b)) of any dispute in connection with the determination of the Purchase Price, (x) in the event the Final Purchase Price equals or exceeds the Estimated Closing Purchase Price, the Working Capital Escrow Amount shall be released to the Seller and the Purchaser shall pay to Seller the amount of any excess, and (y) in the event that the Estimated Closing Purchase Price exceeds the Final Purchase Price, then the Seller shall pay the amount of such excess to the Purchaser first, from the Working Capital Escrow Amount and second, directly from Seller; provided, in the event that there remains any portion of Working Capital Escrow Amount following payment of such amounts pursuant to this clause (y), such remaining portion of the Working Capital Escrow Amount shall be released to Seller. Seller covenants and agrees to promptly execute and deliver

written notice to the Escrow Agent directing the Escrow Agent to release to Purchaser the aggregate amount, if any, due and owing to Purchaser hereunder. Purchaser covenants and agrees to promptly execute and deliver written notice to the Escrow Agent directing the Escrow Agent to release to Seller any portion of the Working Capital Escrow Amount due and owing to Seller hereunder. All amounts payable under this Section 3.5 shall be paid by wire transfer of immediately available federal funds to an account designated by Purchaser or Seller, as the case may be.

3.6     Adequate Notice. Seller covenants and agrees to provide adequate notice to Microsoft Corporation to the extent required under applicable Bankruptcy rules and regulations. Seller further covenants and agrees that within fifteen (15) days following the Closing Date, Seller will provide evidence satisfactory to the Purchaser of the Seller's payment in full of all amounts required to cure any defaults or payments owed under the Purchased Contracts, and the release of any portion of the Working Capital Escrow to the Seller shall be contingent thereon.

## ARTICLE IV

## CLOSING AND TERMINATION

4.1     Closing Date. Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place, and Purchaser and Seller shall consummate the Transactions, at the offices of Baker & McKenzie LLP located at 130 East Randolph Drive, Chicago, Il, 60601 (or at such other reasonable place as Purchaser and Seller may agree) at 10:00 a.m. (local time) on a date mutually agreed to by Purchaser and Seller within two (2) Business Days following the satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." (the "Closing Date").

4.2     Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a)     all of the Purchased Assets, together with one or more duly executed bills of sale, in form and substance customary for transactions of this nature and reasonably acceptable to Purchaser and Seller (a "Bill of Sale");

(b)     one or more duly executed assignment and assumption agreements in form and substance customary for transactions of this nature and mutually acceptable to Purchaser and Seller (an "Assignment and Assumption Agreement") and duly executed assignments of the trademark and patent registrations and applications included in the Purchased Intellectual Property registered in the name of Seller, in a form suitable for recording in the U.S. Patent and Trademark Office (and equivalent offices in jurisdictions outside the United States), and general assignments of all other Purchased Intellectual Property;

(c)    the officer's certificates required to be delivered pursuant to <u>Sections 10.1(a)</u> and <u>(b)</u>;

(d)    a noncompetition agreement in favor of Purchaser with a term of five years;

(e)    *[Intentionally omitted]*

(f)    an affidavit executed by Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(g)    evidence of the execution and proper entry and docketing of the Sale Order; and

(h)    all other instruments of assignment, conveyance and transfer, together with any transfer declarations or other filings in form and substance mutually acceptable to Purchaser and Seller, as may be necessary to convey good and marketable title to the Purchased Assets to Purchaser in accordance with the terms and conditions hereof.

4.3    <u>Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver, or cause to be delivered to Seller:

(a)    the Purchase Price, in immediately available funds, as set forth in Section 3.2 hereof;

(b)    one or more duly executed Assignment and Assumption Agreements; and

(c)    the Lease duly executed by Purchaser; and

(d)    the officer's certificates required to be delivered pursuant to <u>Sections 10.2(a)</u> and <u>(b)</u>.

4.4    <u>Termination of Agreement</u>. This Agreement may (or shall, as the case may be) be terminated prior to the Closing as follows:

(a)    by Purchaser, in the event of Seller's breach of a material warranty, covenant, or representation under this Agreement, that has not been remedied by Seller within ten (10) Business Days after the receipt by Seller of notice of such breach;

(b)    *[Intentionally omitted]*

(c)    *[Intentionally omitted]*

(d)    by Purchaser, if the Bidding Procedures approved by the Bidding Procedures Order or the Bidding Procedures Order is amended or modified (without Purchaser's prior written consent);

(e)       by Purchaser at any time on or prior to the tenth (10th) calendar day following the Petition Date, if Purchaser's due diligence review of the Business or the Purchased Assets or the opportunity represented thereby (i) is not satisfactory to Purchaser for any reason as determined by Purchaser in its sole and absolute discretion, or (ii) Purchaser is not satisfied for any reason with the Seller's list of creditors to be given notice of the Bankruptcy Case and the Transactions;

(f)       by Purchaser if the Sale Order is the subject of an appeal or if the automatic stay under Bankruptcy Rule 6004(h) has not been waived;

(g)       by Purchaser upon exercise of any other termination right set forth herein;

(h)       by mutual written consent of Seller and Purchaser;

(i)       by Purchaser or Seller, if the Closing shall not have occurred by the close of business on the Termination Date; provided, however, that if the Closing shall not have occurred on or prior to the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or Seller, then the breaching party may not terminate this Agreement pursuant to this Section 4.4(i);

(j)       automatically, without any action by Purchaser or Seller, if (i) Seller accepts or consummates a Competing Transaction, (ii) Purchaser is not declared the winning bidder at the auction provided for in the Bidding Procedures, if there is an auction, or (iii) Seller files a plan contemplating the reorganization or sale of all or any part of Seller or its assets under the Bankruptcy Code inconsistent with the Transactions;

(k)       by Seller, in the event of Purchaser's breach of a material warranty, covenant, or representation under this Agreement, that has not been remedied by Purchaser within ten (10) Business Days after the receipt by Purchaser of notice of such breach under this Agreement; and

(l)       by Seller or Purchaser if there shall be in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions.

4.5       Procedure Upon Termination. In the event of termination pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other party or parties and this Agreement shall (except to the extent provided elsewhere herein) terminate, and the Transactions shall be abandoned, without further action by Purchaser or Seller. If this Agreement is terminated as provided herein, each party shall destroy or redeliver all documents, work papers and other written material of any other party relating to the Transactions, whether so obtained before or after the execution hereof, to the party furnishing the same unless such materials have become publicly disclosed prior to such termination.

4.6       Effect of Termination. In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without

liability to Purchaser or Seller except as otherwise provided in <u>Section 7.2</u> and in the Bidding Procedures Order, if entered; provided, however, that the provisions of <u>Section 7.2</u> and <u>Article XI</u> hereof shall survive any such termination and shall be enforceable hereunder; <u>provided further, however,</u> that nothing in this <u>Section 4.6</u> shall be deemed to release any party from liability for any breach of its obligations under this Agreement.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that:

5.1    <u>Organization and Good Standing</u>.    Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and, subject to the limitations imposed on Seller as a result of having filed a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease and operate its properties and to carry on the Business as now conducted. Seller has no subsidiaries and there are no corporations, joint ventures, partnerships or other entities or arrangements in which Seller, directly or indirectly, owns any capital stock or an equity interest.

5.2    <u>Authorization of Agreement</u>.    Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, Seller has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby to which it is a party and to perform its obligations hereunder. The execution and delivery of this Agreement by Seller and each other agreement, document or instrument contemplated hereby to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller. This Agreement and each other agreement, document or instrument contemplated hereby to which Seller is a party has been duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by Purchaser, the entry of the Sale Order and receipt of such other authorization as is required by the Bankruptcy Court) this Agreement and each other agreement, document or instrument contemplated hereby to which it is a party constitute legal, valid and binding obligations of Seller enforceable against Seller in accordance with its terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3    <u>Conflicts; Consents of Third Parties</u>.

(a)    Except as set forth on <u>Schedule 5.3(a)</u>, the execution and delivery by Seller of this Agreement and each other agreement, document or instrument contemplated hereby to which it is a party, the consummation of the transactions contemplated hereby, and compliance by Seller with any of the provisions hereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the Certificate of Formation, Limited Liability Company Agreement and other organizational documents of Seller; (ii) subject to entry of the Sale Order or any other Order entered by the

Bankruptcy Court, any Contract, or Permit to which Seller is a party or by which any of the properties or assets of Seller are bound; (iii) subject to entry of the Sale Order, any Order of any Governmental Body applicable to Seller or any of the properties or assets of Seller as of the date hereof; or (iv) subject to entry of the Sale Order, any applicable Law.

(b)    Except as set forth on <u>Schedule 5.3(b)</u> and except to the extent required under the Sale Order or any other Order entered by the Bankruptcy Court, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller in connection with the execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby to which it is a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller of any other action contemplated hereby or thereby, except the entry of the Sale Order.

5.4    <u>Absence of Changes</u>.    Except as set forth on <u>Schedule 5.4</u> attached hereto, since March 29, 2009, Seller has not: (i) sold, leased, assigned or transferred any of its material tangible assets related to or used in the Business except in the ordinary course of business; (ii) sold, assigned, licensed, transferred or encumbered any Intellectual Property, or sublicensed any material Intellectual Property, outside of the ordinary course of business or abandoned or permitted to lapse any Intellectual Property; (iii) made or granted any bonus or any wage or salary increase to any employee or group of employees (except as required by pre-existing contracts or consistent with past practice), or made or granted any increase in any Employee Benefit Plan, or amended, terminated or adopted any Employee Benefit Plan; (iv) made any loans or advances to, or guarantees for the benefit of, any Person (other than Seller); (v) waived any rights of material value, outside of the ordinary course of business; (vi) suffered any damage, destruction or casualty loss to its tangible assets related to or used in the Business, whether or not covered by insurance; (vii) changed in any material respect its method of accounting or accounting policies or changed any business practice in any material respect; (viii) entered into any other material transaction not in the ordinary course of business; or (ix) agreed or committed to do any of the foregoing.

5.5    <u>Purchased Assets</u>.    Except as set forth on <u>Schedule 5.5</u>, Seller owns good and marketable title to the Purchased Assets, and, subject to the entry of the Sale Order, Purchaser will be vested with good and marketable title to such Purchased Assets, free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. Subject to the receipt of any Necessary Consents, the Purchased Assets include all of the material assets that are necessary to operate the Business.

5.6    <u>Taxes</u>.    Except as set forth on <u>Schedule 5.6</u>, (i) Seller has timely filed all material Tax Returns required to be filed with the appropriate Tax Authorities, and all such Tax Returns are correct and complete in all material respects; (ii) except as to Taxes the payment of which is prohibited or stayed by the Bankruptcy Code, Seller has paid all material Taxes due and payable by it and all material Taxes for which Seller is liable as a result of transferee liability, joint and several liability, contractual liability or otherwise (whether or not such Taxes are shown on any Tax Return); (iii) Seller has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor,

stockholder, or other third party; (iv) Seller has not received any written notice of deficiency or assessment from any Tax Authority with respect to liabilities for Taxes of Seller which have not been reserved for, fully paid or finally settled; (v) Seller has not agreed to any currently effective waiver of any statute of limitations in respect of Taxes or agreed to any currently effective extension of time with respect to a Tax assessment or deficiency; (vi) no Tax audit, examination, or other proceeding regarding Taxes is in progress or threatened in writing, with respect to Seller; and (vii) no claim has been made in the last five (5) years by a Tax Authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by that jurisdiction.

     5.7    <u>Intellectual Property</u>.  <u>Schedule 5.7(a)</u> sets forth a complete and accurate list of all registered Intellectual Property and material unregistered Intellectual Property.  Except as set forth on <u>Schedule 5.7(b)</u>, Seller (x) owns the entire right, title, and interest in all Purchased Intellectual Property registered in the name of Seller and (y) has a valid license to use pursuant to a Purchased Contract all Purchased Intellectual Property licensed to Seller (in the latter case, subject to the receipt of any Necessary Consents).  Subject to the receipt of any Necessary Consents, the Purchased Intellectual Property is all the Intellectual Property needed to conduct the Business with respect to the Purchased Assets as conducted prior to the Closing.  Except as set forth on <u>Schedule 5.7(c)</u>, no claims are pending against Seller before a Governmental Body or, to the Knowledge of Seller, threatened with regard to the ownership by Seller of any Purchased Intellectual Property.  All material Purchased Intellectual Property is subsisting, is not expired or abandoned, and is valid and enforceable.  Except as set forth on <u>Schedule 5.7(d)</u>, no material owned Purchased Intellectual Property is subject to any Order or agreement materially restricting the use thereof by Seller, or materially restricting the licensing thereof by Seller to any Person, and Seller has taken commercially reasonable action to maintain and protect all material Purchased Intellectual Property.  Except as set forth on <u>Schedule 5.7(e)</u>: (i) to the Knowledge of Seller, Seller has not infringed, misappropriated or otherwise violated any intellectual property rights of any other Person, (ii) Seller has not received any written notices regarding the foregoing (including any demands or offers to license any Intellectual Property from any third party); and (iii) to the Knowledge of Seller, the Purchased Intellectual Property is not being infringed, misappropriated or otherwise violated by any other Person.

     5.8    <u>Employee Benefits</u>.

     (a)    <u>Schedule 5.8(a)</u> sets forth a complete and correct list of all Employee Benefit Plans currently contributed to or maintained by Seller or any ERISA Affiliate in respect of or for the benefit of Employees or otherwise with respect to which Seller or an Employee Benefit Plan has any Liability.  All Employee Benefit Plans are, and have been, maintained in compliance with their terms and applicable Law in all material respects.

     (b)    Other than as set forth on <u>Schedule 5.8(b)</u>, neither Seller nor any ERISA Affiliate has maintained or contributed to an Employee Benefit Plan subject to Title IV of ERISA.

     (c)    Except as set forth on <u>Schedule 5.8(c)</u>, Seller has no liability for accrued vacation in excess of $60,000 in the aggregate.

5.9    <u>Litigation</u>. Except as set forth on <u>Schedule 5.9</u>, there are no (and, during the two years preceding the date hereof, have not been any) material Legal Proceedings pending or, to the Knowledge of Seller, threatened in writing against Seller or its predecessor before any Governmental Body.

5.10    <u>Brokers</u>. Except as set forth on <u>Schedule 5.10</u>, Seller has no obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person in connection with the Transactions. For the avoidance of doubt, no such compensation shall constitute Assumed Liabilities.

5.11    <u>Contracts</u>.

(a)    Except as set forth on <u>Schedule 5.11(a)</u>, as of the date hereof, Seller is not a party to or bound by any written: (i) collective bargaining agreement or contract with any labor union; (ii) Contract relating to any loan or advances to, or any investments in, any Person; (iii) Contract relating to the mortgaging, pledging or otherwise placing a Lien on any material portion of any Purchased Asset; (iv) guaranty of any obligation of any third party (excluding, for the avoidance of doubt, Seller) for borrowed money; (v) Contract under which it is lessee of any material personal property primarily used in the operation of the Business which is owned by any other party; (vi) Contract for the purchase or sale of products or services primarily related to or used in the Business that require by their terms payments in excess of $25,000 per year and are not terminable by Seller on thirty (30) days or less prior notice; (vii) Contract relating to the licensing by or to Seller or to or by a third party of Intellectual Property primarily used in the operation of the Business (except for commercially available, off-the-shelf software licensed and all other agreements materially impairing Seller's ability to use or disclose Intellectual Property); (viii) Contract which would prohibit Purchaser, as assignee of Seller (whether or not so assigned to Purchaser), from freely engaging in the Business; (ix) Contract for the employment of any officer, individual employee or other Person in connection with the operation of the Business on a full time, part time, consulting or other basis providing for annual compensation in excess of $100,000 per annum; (x) Contract related to any warranty by Seller with respect to services rendered or products sold in the operation of the Business which could reasonably be expected to involve payments or costs and expenses in excess of $5,000 per year (collectively, the "<u>Material Contracts</u>").

(b)    Except as disclosed on <u>Schedule 5.11(b)</u>, (i) to the Knowledge of Seller, (A) no Purchased Contract has been breached or canceled by any other party thereto and (B) no event or circumstance has occurred that, with notice or lapse of time or both, would constitute a default or breach by any other party thereunder, (ii) except for defaults arising solely as a consequence of the commencement of the Bankruptcy Case, Seller is not in default or breach under the terms of any Purchased Contract and, to the Knowledge of Seller, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute a default or breach by Seller thereunder, (iii) Seller has not assigned, delegated or otherwise transferred to any Person any of its rights, title or interest under any Purchased Contract (other than pursuant to a Purchased Contract listed on <u>Schedule 5.11(a)</u>, and (iv) each Purchased Contract is legal, valid, binding, enforceable against the applicable Seller and, to the Knowledge of Seller, the other party thereto, and in full force

and effect and, subject to the terms of this Agreement, including the receipt of any Necessary Consents, will continue as such following the consummation of the transactions contemplated hereby.

(c)     Seller has provided or made available to Purchaser a true and correct copy of all Purchased Contracts, in each case together with all amendments, waivers or other modifications thereto.

5.12    <u>Labor and Employment Matters</u>. Except as set forth on <u>Schedule 5.9</u> or <u>Schedule 5.12</u>: (i) there are no pending or, to the Knowledge of Seller, threatened material labor or employment Legal Proceedings; (ii) to the Knowledge of Seller, (x) no union organizing or decertification efforts are underway or threatened and (y) no such activities have occurred in the Business in the past five (5) years; (iii) there is no strike, slowdown, work stoppage, lockout or other material job action underway, or to the Knowledge of Seller, threatened, and no such job action has occurred in the Business in the past five (5) years; and (iv) within the past three (3) years, the Business has not experienced any layoff of employees that would reasonably be expected to implicate the WARN Act.

5.13    <u>Environmental and Safety Requirements</u>. Seller has operated the Business in compliance in all material respects with all applicable Environmental and Safety Requirements. Except as set forth on <u>Schedule 5.13</u>, neither Seller nor any Affiliate has in the past two (2) years received any written notice regarding any actual or alleged material violation of or material liability under Environmental and Safety Requirements relating to the Business or the ownership or operation of the Purchased Assets. Neither Seller nor any Affiliate has treated, stored, disposed of, transported, handled, manufactured, or to the Knowledge of Seller, released any hazardous substance generated by the Business in material violation of any applicable Environmental and Safety Requirements.

5.14    <u>Compliance with Laws; Permits</u>. Except as set forth on <u>Schedule 5.14</u>: (a) the Business and the Purchased Assets have been operated by Seller and its Affiliates in compliance in all material respects with all applicable Laws, and no written notices have been received and, to the Knowledge of Seller, no claims have been filed alleging a material violation of any such Laws; and (b) the Business and the Purchased Assets have been operated by Seller and its Affiliates in compliance in all material respects with all Permits required to be held for the conduct of its Business, and all such Permits are listed on <u>Schedule 5.14</u>.

5.15    <u>Customers and Suppliers</u>. Seller has provided to Purchaser a list of the top ten (10) suppliers ("<u>Material Suppliers</u>") and top ten customers ("<u>Material Customers</u>") of the Business (in each case, taken as a whole) by volume of sales and purchases, respectively, for the twelve (12) month period ended March 29, 2009. Except as set forth on <u>Schedule 5.15</u>, to the Knowledge of Seller, Seller has not received any notice from any Material Supplier or Material Customer to the effect that any Material Supplier will stop, or materially decrease the rate of, supplying materials, products or services to Seller relating to the Purchased Assets or that any Material Customer will stop, or materially decrease the rate of, purchasing materials or services from Seller.

5.16    Affiliate Transactions.  Except as set forth on Schedule 5.16, to the Knowledge of the Seller, no officer, director, shareholder or Affiliate of Seller, immediate family member of the foregoing Persons, or Affiliate of any of the foregoing Persons is a party to any Contract (other than Employee Benefit Plan arrangements disclosed on Schedule 5.8(a) or Schedule 5.11) or has any material interest in any Purchased Asset.

5.17    Financial Statements.  The unaudited balance sheet and income statement of the Business dated December 31, 2008 and March 29, 2009, respectively, provided to Purchaser (collectively, the "Financial Statements") (a) are true, complete and correct in all material respects; (b) are in accordance with the books and records of Seller; (c) present fairly in all material respects the assets, liabilities and financial condition of the Business as of the respective dates thereof, and the results of operations for the periods then ending; and (d) have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved. Seller has no liability or obligation related to the Business or the Purchased Assets that is not reflected or reserved against in the Financial Statements other than liabilities incurred in the ordinary course of business.

5.18    Proper Notice.  On or before the date of the hearing regarding the Sale Order and at all times prior to the Closing Date, the Seller will have given due and proper notice of the Bankruptcy Case and all other proceedings relating to the Transactions contemplated hereby to all Persons who have a Lien on the Purchased Assets or who are otherwise required to receive notices under the Bankruptcy Code in order for Purchaser to receive good and marketable title to the Purchased Assets free and clear of all Liens other than Permitted Encumbrances, including without limitation, actual notice to all Persons holding Liens of record.

5.19    "AS IS" TRANSACTION.    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLER DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS OR ANY OTHER MATTER WHATSOEVER RELATING TO THE BUSINESS.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, EXCEPT AS OTHERWISE SET FORTH HEREIN, THE SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. ACCORDINGLY, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THE PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS" AND "WITH ALL FAULTS."

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

6.1    Organization and Good Standing.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware and has the requisite power and authority to enter into and perform its obligations under this Agreement.

6.2     Authorization of Agreement. Purchaser has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder.    The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby to which Purchaser is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Purchaser.  This Agreement and each other agreement, document or instrument contemplated hereby to which Purchaser is a party has been duly and validly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement and each other agreement, document or instrument contemplated hereby to which Purchaser is a party constitute legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3     Conflicts; Consents of Third Parties.

(a)     The execution and delivery by Purchaser of this Agreement and each other agreement, document or instrument contemplated hereby to which Purchaser is a party, the consummation of the transactions contemplated hereby and thereby, or compliance by Purchaser with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the Certificate of Formation, Limited Liability Company Agreement or comparable organizational documents of Purchaser; (ii) any Contract to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound; (iii) any Order of any Governmental Body applicable to Purchaser or any of the properties or assets of Purchaser as of the date hereof; or (iv) any applicable Law.

(b)     No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the taking by Purchaser of any other action contemplated hereby or thereby.

6.4     Financing. Purchaser has sufficient available cash to enable it to pay the Purchase Price.