**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Interlake Material Handling, Inc., *et al.*,[1] | ) | Case No. 09-10019 (KJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Objection Deadline: July 15, 2009 at 4:00 p.m. (ET) |
| | ) | Hearing Date: July 22, 2009 at 2:00 p.m. (ET) |

**DEBTORS' MOTION TO APPROVE (A) THE APA, (B) SALE OF CERTAIN ASSETS AND INTERESTS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS, (C) THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS RELATING TO THE JDM BUSINESS AND (D) RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors", or "Seller"), hereby move (the "Sale Motion") the Court, pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (11 U.S.C. §§ 101 et seq., the "Bankruptcy Code") and rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of orders approving (A) The APA, (B) Sale of Certain Assets and Interests Free and Clear of Liens, Claims and Interests, (C) The Assumption And Assignment Of Contracts Relating To The JDM Business, and (D) Related Relief (the "Proposed Sale").

**JURISDICTION**

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Interlake Material Handling, Inc. (9435) ("IMH"), United Fixtures Company, Inc. (2048) ("UFC"), UFC Interlake Holding Co. (9905) ("UFC Holding"), Conco-Tellus, Inc. (9950) ("CT" and, together with IMH, UFC and UFC Holding, the "Original Debtors"), and J&D Company, LLC (6376) ("J&D"). The address for all of the Debtors is 1230 E. Diehl Road, Suite 400, Naperville, Illinois 60563, except for United Fixtures Company, Inc., whose address is 4300 Quality Drive, South Bend, Indiana 46628 and J&D Company, LLC whole address is 600 Hunter Lane, Middeltown, PA 17057.

2. The statutory bases for the relief requested herein are sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006

## Background

3. On May 20, 2009 (the "Petition Date"), J&D filed a voluntary case under chapter 11 of the Bankruptcy Code.

4. J&D is a wholly owned subsidiary of UFC which, in turn, is a wholly owned subsidiary of UFC Holding. The chapter 11 cases of J&D, UFC and UFC Holding are being jointly administered in this Court with the chapter 11 cases of Interlake Material Handling, Inc. and Conco-Tellus, Inc. under bankruptcy case number 09-10019 filed in this Court.

5. J&D has two divisions – Retail Service Solutions ("RSS") and J&D Manufacturing ("JDM"). RSS is a rapidly-growing service provider to multi-location retailers and property managers with service offerings including electromechanical services, lighting maintenance and retrofits, fixture installations and safety installations. JDM is an industry leader in the manufacturing of vertical storage and carousel systems. JDM also manufactures rack and shelving for industrial applications.

6. As a consequence of the decline in activity in the residential and commercial construction industry and the decline in economic growth across most sectors of the United States economy, J&D and its parent company, UFC, experienced a reduction in business across all market segments. In addition to the decline in customer orders, increases in commodity prices, particularly steel, had a significant negative impact on UFC's profitability during the second half of calendar year 2008. A subsequent decrease in steel prices (and a corresponding decrease in the value of UFC's inventory) led to a tightening of credit availability under the group's pre-petition working capital facility. These and other events led to UFC operating losses

that could not be sustained over an extended period of time without creating liquidity constraints that ultimately would prevent UFC, and therefore, J&D, from continuing to operate.

7. The Debtors, with the assistance of their professionals, have been marketing themselves for sale in bankruptcy since November of 2008. As a result of these efforts, they entered into a "stalking horse" purchase agreement with the Mecalux on December 13, 2008, under which Original Debtors would sell substantially all their Assets to the Mecalux, subject to receipt of any higher and better bids, for $30 million plus the assumption of certain liabilities.

8. On January 6, 2009, the Original Debtors filed the Debtors' Motion for Orders: (I) (A) Approving Bid Procedures for the Sale of Substantially All the Debtors' Assets (the "Interlake Bidding Procedures"), (B) Scheduling the Auction, (C) Authorizing Payment of the Break-Up Fee and Expense Reimbursement, (D) Approving the Deposit Escrow Agreement (E) Scheduling the Sale Hearing, (E) Approving the Assumption and Assignment Procedures Related to the Sale and (F) Approving the Form of the Sale Notice; and (II) (A) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests (the "Interlake Assets"); (B) Authorizing and Approving Purchase Agreement; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (D) Granting Related Relief (Docket No. 316, the "Mecalux Sale Motion").

9. On January 21, 2009, the Court entered an Order approving the Interlake Bidding Procedures [Docket No. 111]. The Original Debtors did not receive any additional bids for the Interlake Assets by the bid deadline.

10. On March 5, 2009 the Court entered an order approving the Mecalux Sale and Mecalux Sale Motion in its entirety, as no higher bid was received for the Original Debtors'

Assets. [Docket No. 316]. Thereafter, on March 9, 2009 the closing of the Mecalux Sale occurred.

11. Following the closing of the Mecalux Sale, the Original Debtors' principal remaining assets were the equity interest in J&D and certain intangible assets not included in the Mecalux Sale, primarily consisting of accounts receivable and certain litigation claims (including avoidance actions).

12. As a result of their extensive marketing efforts, J&D entered into a "stalking horse" purchase agreement with RSS Holdings, LLC on May 20, 2009 (the "Stalking Horse APA"), under which J&D would sell substantially all the assets of RSS to RSS Holdings, LLC, subject to receipt of any higher and better bids for $900,000 plus the assumption of certain liabilities.

13. On May 20, 2009, the Debtors filed that certain Motion for entry of orders (I)(A) Approving Bid Procedures For The Sale Of A Portion Of J&D's Assets, (B) Scheduling The Auction, (C) Authorizing Payment Of The Break-Up Fee, (D) Approving The Deposit, (E) Scheduling The Sale Hearing, (F) Approving The Assumption And Assignment Procedures Related To The Sale And (G) Approving The Form Of The Sale Notice; And (II) (A) Authorizing The Sale Of Such Assets Free And Clear Of Liens, Claims, Encumbrances, And Other Interests; (B) Authorizing And Approving Purchase Agreement; (C) Approving The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases Related Thereto; And (D) Granting Related Relief (the "RSS Sale Motion").

14. At an auction held on June 23, 2009 (the "RSS Auction"), Interlake Mecalux, Inc. (the "Purchaser") provided the Debtors the winning bid for RSS for $1.275 million plus the assumption of certain liabilities. The Purchaser's winning bid at the RSS Auction was higher

than the second highest offer the Debtors had at the time by approximately $500,000, after efforts to increase the offers from the Purchaser and the stalking horse bidder, RSS Holdings, LLC, and also added value to the Debtors' estates by, among other things, providing a competitive auction process for the RSS business line at the RSS Auction. As part of the effort to induce the Purchaser to bid for the RSS business line, the Debtors agreed that if the Purchaser won the RSS Auction the Debtors would sell the Purchaser the JDM business via private sale, as the Purchaser was only interested in bidding for RSS if the Purchaser could also purchase JDM.

### Relief Requested

15.     To effectuate the consummation of the proposed sale the Debtors are requesting, pursuant to sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, the entry of an order substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Sale Order</u>") and approving (a) the sale of the JDM business, free and clear of all liens, claims, encumbrances, and other interests, (b) the APA (as defined herein below) and (c) the assumption and assignment of the Purchased Contracts.

### The Proposed Sale of the JDM Business

16.     On June 22, 2009, J&D Company, LLC and the Purchaser entered into that certain Assets Purchase Agreement (the "<u>APA</u>") whereby the Purchaser agreed to purchase the Purchased Assets (as defined in the APA and as referred to herein from time to time, the "<u>Assets</u>") for $350,000 (the "<u>Offer</u>") after the Debtors and its legal and financial advisors examined the Offer and concluded that it provided a far better outcome than selling the JDM business (the remaining material assets of J&D after the RSS Auction) to another bidder via an auction of those assets. Specifically, the Debtors believe that the sale of the JDM business to Purchaser pursuant to the terms of the Offer provides a purchase price for the JDM business that significantly exceeds the value ascribed to such line of business that could otherwise be obtained

5

via an auction of those assets to another bidder and may maintain jobs of J&D employees in a difficult economy.

17.     Time is of the essence with respect to the Proposed Sale. Importantly, the DIP Lenders, who will receive all of the proceeds resulting from the Proposed Sale per the terms of their liens on the Assets and per the terms of the proposed plan of liquidation proposed by the Debtors (which the Debtors intend to seek confirmation of by early August 2009), support going forward with the Proposed Sale as a private sale. In addition, prior to the Petition Date, the Debtors and their professionals performed extensive marketing efforts resulting in little interest in the Assets that are the subject of the Proposed Sale. Moreover, the Purchaser also informed the Debtors that the timing of the Proposed Sale is critical, because each day that the JDM business is subject to the uncertainty of the on-going wind-down process and the overhang of bankruptcy, the going concern value of the business is in danger of being diminished. To preserve the ongoing concern value of the JDM business, the Purchaser is requiring that the Proposed Sale be consummated as soon as possible.

### The Terms of the Proposed Sale

18.     The following is a summary of the salient terms of the Proposed Sale set forth in the APA:[2]

| Purchase Price | $350,000.00 |
|---|---|
|  |  |
| Closing | Two (2) Business Days following the satisfaction or waiver of the conditions set forth in Article X |
|  | . |

---

[2] The terms of the APA are summarized here for the convenience of the Court and parties in interest. To the extent that there are any discrepancies, the terms of the APA shall govern. Capitalized terms used in this summary that are not defined herein shall have the meanings ascribed to them in the APA.

| | |
|---|---|
| **Assets to be Purchased** | The assets primarily used in, or primarily related to the operation of, the Business including: (1) all security deposits and prepaid expenses to the extent related to the Business; (2) the Purchased Inventory (which includes all inventory except for excluded inventory listed in the APA); (3) the Purchased Contracts; (4) all Equipment; (5) the Purchased Intellectual Property; (6) all Documents that are used in, held for use in or intended to be used in, or that relate to, the Assets, the Assumed Liabilities or the Business or operation of the Business; (7) the Assigned Permits; (8) all goodwill, including all goodwill associated with the Business Name and the other Purchased Intellectual Property; and (9) all rights of Seller under non-disclosure or confidentiality agreements and invention assignment agreements with Employees, contractors, and agents of Seller or with third parties to the extent relating to the Business or the Assets (or any portion thereof) |
| | |
| **Excluded Assets** | Excluded Assets shall include the following: (1) all cash and cash equivalents; (2) all accounts, notes and other receivables; (3) all Tax refunds and credits relating to the Assets, the Business and the Hired Employees for all periods (or portions thereof) ending on or before the Closing Date and any Tax refunds, credits and other Tax attributes of the Seller; (4) any minute books, stock ledgers, corporate seals, stock certificates and other similar records which, by law, Seller is required to retain in its possession; (5) all Contracts (other than the Purchased Contracts); (6) any and all rights, claims, duties or powers of Seller pursuant to Chapter 5 of the Bankruptcy Code and any proceeds thereof; (7) all insurance policies; (8) all finished goods inventory; and (9) all rights of Seller under the Agreement |
| | |
| **Assumed Liabilities** | Assumed Liabilities include only those obligations of Seller pursuant to the terms and conditions set forth in the Purchased Contracts |

7

| | |
|---|---|
| | which arise after the Closing Date |
| | |
| **Purchaser's Conditions to Closing** | The obligations of Purchaser include the following conditions (any or all of which may be waived in writing by Purchaser in whole or in part to the extent permitted by applicable Law): (1) material representations and warranties shall be true and correct in all material respects on and as of the Closing; (2) Seller shall have performed and complied in all material respects with all obligations and agreements required in the Agreement to be performed or complied with by it prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect; (3) Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2 of the Agreement; (4) no Seller Material Adverse Effect shall have occurred since the date of the Agreement and be continuing; (5) there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; and (6) the Bankruptcy Court shall have entered the Sale Order and either (i) the automatic stay imposed by Bankruptcy Rule 6004(h) has been waived and Purchaser has agreed to waive the condition that the Sale Order has become a Final Order, or (ii) the Sale Order shall have become a Final Order. |
| | |

19. The APA, as executed, is attached hereto as Exhibit B.

### The Sale Order

20. Pursuant to the Sale Order, the Debtors are seeking approval of the APA and approval of the Proposed Sale. In addition, the Sale Order will authorize the assumption and assignment of the Purchased Contracts.

### Assumption and Assignment of Executory Contracts

21. To facilitate the operation of the JDM business, the Purchaser is requiring that J&D assume and assign certain executory contracts and unexpired leases (collectively, the "Purchased Contracts"). The assumption and assignment of the Purchased Contracts to the Purchaser may require the curing of any defaults existing under the Purchased Contracts as required by section 365 of the Bankruptcy Code (the cost of such cure, the "Cure Costs"), as such Cure Costs are set forth on that certain contract and cure schedule attached hereto as Exhibit C (the "Contract and Cure Schedule"). Pursuant to the terms of the APA, the Purchaser is responsible for the payment of any such Cure Costs.

### Basis for Relief

**A. The Proposed Sale is an Exercise of the Debtors' Sound Business Judgment and Should be Approved.**

22. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, as follows: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . ." 11 U.S.C. § 363(b)(1). The purpose of requiring notice and a hearing if a transaction is other than in the ordinary course of business is so that creditors, who have a vital interest in maximizing realization of value from assets of the estate, have an opportunity to review the terms of the proposed transaction and to object if they deem the terms and conditions are not in their best interest. *See In re Caldor, Inc.*, 193 B.R. 182, 186 (Bankr. S.D.N.Y. 1996).

23. Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, the Second Circuit has required that such use, sale or lease be based upon the sound business judgment of the debtor. *See Official Comm. of Unsecured Creditors of LTV Aerospace*

9

*and Def v. LTV Aerospace and Def (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business). In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts generally will not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litig. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). However, if objections are considered, then "an objection . . . is required to produce some evidence respecting its objections." *In re Lionel Corp.*, 722 F.2d at 1071.

24. The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. at 615-16 ("a presumption of reasonableness attaches to a debtor's management decisions"). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

25. Based on these principles, the Court should grant the Motion and approve the Proposed Sale. In the event the Proposed Sale is not consummated, the Debtors will be forced to initiate a lengthy auction process to sell the JDM business line. The Debtors believe that the

$350,000 purchase price paid by the Purchaser for the Assets of the JDM business greatly exceeds any value that could be obtained in an auction of the JDM business to another bidder, especially after accounting for the costs associated with an additional auction. As such, the Debtors determined the Proposed Sale would maximize the value of the Assets of the JDM business for its estate and its stakeholders. In addition, the Proposed Sale will allow portions of the JDM business to remain in operation as a going concern, which may allow a substantial portion of the employees to keep their jobs in difficult economic times. Accordingly, the Offer represents the highest or best offer that the Debtors will receive for the Assets of the JDM business. As such, the Debtors submit that the Proposed Sale is a sound exercise of its business judgment, is consistent with its duty to maximize value and is in the best interests of its estate and its stakeholders.

**B.   The Proposed Private Sale is Appropriate Pursuant to Bankruptcy Rule 6004.**

26.   Bankruptcy Rule 6004(f)(1) provides that sales not in the ordinary course of business may be by private sale or by public auction. Courts often allow chapter 11 debtors to sell assets outside the ordinary course of business by private sale when the debtors demonstrate that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code. *See, e.g., In re Parmalat U.S.A. Corp., et al.*, 04-11139 (RDD) (Bankr. S.D.N.Y. June 24, 2004) (Docket No. 497) (authorizing the sale of the debtor's ice cream distribution business in Atlanta, Georgia pursuant to a private sale); *Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.)*, 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving a private sale of a chapter 11 debtor's assets where the standards of section 363(b) were met); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale). *Cf. In re Embrace Sys. Corp.*, 178 B.R. 112, 113 (Bankr. W.D.

11

Mich. 1995) (holding that a private sale of a chapter 11 debtor's assets is appropriate if all provisions of section 363 of the Bankruptcy Code are followed, the bid is fair and the sale is in the best interests of the estate and its creditors).

27.     The Debtors submit that a private sale not subject to higher and better offers is appropriate and necessary under the circumstances. First, the DIP Lenders support the Proposed Sale as a private sale and any delay in the sale of the JDM business directly impacts the timing of the Debtors paying down the DIP Facility. If the JDM business is not sold through the Proposed Sale, it likely would have to be sold to another bidder via a public auction or another private sale. Second, the Debtors, at this point in their bankruptcy cases, are not in a position to use estate property and resources to pay a "break-up" fee in connection with the Proposed Sale, or even reimburse the Purchaser for its related costs and expenses.

28.     In addition, the Purchaser was not willing to serve as a stalking horse in an auction or expend significant resources in the diligence and sale process only to be outbid. Third, since the announcement of the wind down and the related uncertainty, the JDM business is in danger of losing customers quickly. As a result, the going concern value of the JDM business is diminishing on a daily basis, and a fast sale is essential to preserving and restoring the value of the Assets of the JDM business. Accordingly, and for all of the foregoing reason, the Debtors submit their decision and agreement to sell the Assets of the JDM business in a private sale pursuant to the terms of the APA is based on its sound business judgment and is in the best interests of its estates and its stakeholders.

C. **The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, Encumbrances and Interests.**

29. Section 363(f) of the Bankruptcy Code provides that a debtor in possession may sell property free and clear of liens, claims, encumbrances and other interests if any one of the following conditions is satisfied:

> (1) applicable nonbankruptcy law permits the sale of such property free and clear of such interest;
>
> (2) the [lienholder or claimholder] consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) the [lienholder or claimholder] could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

30. Notably, section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any one of its five requirements will suffice to warrant approval of the Proposed Sale of the JDM business by the Debtors free and clear of Liens (as defined in the APA), claims, encumbrances and other interests. *See 11 U.S.C. § 363(f); see also In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, *12 (Bankr. S.D.N.Y. Mar. 6, 1992); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (because section 363(f) is written in the disjunctive; a court may approve a sale "free and clear" provided that at least one of the subsections is applicable).

31. The Debtors believe it is appropriate for the Assets of the JDM business to be sold free and clear of Liens, claims, encumbrances and interests pursuant to section 363 of the Bankruptcy Code. To that end, and for other reasons, the Debtors believe that, at a minimum, all

holders of interests in the JDM business could be compelled to accept a money satisfaction of their interests in legal or equitable proceedings in accordance with section 363(f)(5) of the Bankruptcy Code to the extent that such interests are sought to be discharged in the Sale Order. Accordingly, the Debtors submit that any existing interests in the JDM business will be satisfied by the distribution of the Sale Proceeds. Specifically, upon the closing of the Proposed Sale, the Debtors will transfer the Sale Proceeds to the DIP Lenders. Based upon the foregoing, the Proposed Sale free and clear of Liens, claims, encumbrances and interests (except as otherwise provided) will satisfy the requirements of section 363(f) of the Bankruptcy Code. Accordingly, the Assets of the JDM business should be transferred to the Purchaser free and clear of all Liens, claims, encumbrances and interests.

**D.   The Prospective Purchaser is a Good Faith Buyer and is Entitled to the Protection of Section 363(m) of the Bankruptcy Code and the Transfer of the JDM Business Does Not Violate Section 363(n) of the Bankruptcy Code.**

32. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Although the Bankruptcy Code does not define "good faith," the Second Circuit held in *Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269 (2d Cir. 1997) that:

> The 'good faith' component of the test under § 363(m) speaks to the equity of the [bidder's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at the judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

111 F.3d at 276. Moreover, section 363(n) of the Bankruptcy Code provides that a sale procured by collusion may be avoided. 11 U.S.C. § 363(n) ("The Trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale...").

33.  The APA was negotiated at arm's length and in good faith by the Debtors and the Purchaser. Moreover, the APA reflects give-and-take and negotiated compromises by both sides. Accordingly, the Purchaser is a good faith purchaser entitled to the protection afforded by section 363(m) of the Bankruptcy Code.

E.  **The Assumption and Assignment of the Purchased Contracts Should Be Authorized.**

34.  Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." *See* 11 U.S.C. § 365(a). Section 365(f)(2) of the Bankruptcy Code provides that a debtor in possession may assign an executory contract or unexpired lease of the debtor only if (a) the debtor in possession assumes such contract or lease in accordance with the provisions of section 365 and (b) adequate assurance of future performance by the assignee of such contract or lease is provided. *See* 11 U.S.C. § 365(f)(2). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an executory contract or unexpired lease of a debtor and provides:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee
>
> (A) cures or provides adequate assurance that the trustee will promptly cure, such default . . .;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

35. With respect to section 365(b)(1)(C) of the Bankruptcy Code, the meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y.), *aff'd*, 993 F.2d 300 (2d Cir. 1993). When an executory contract or lease is to be assumed and assigned, adequate assurance of future performance may be provided by, among other things, demonstrating the financial health of the assignee and its experience and ability in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when a prospective assignee of a lease from a debtor has financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of success).

36. To assist in the assumption and assignment of the Purchased Contracts, the Debtors also request the Court enter an order providing that certain anti-assignment provisions in the Purchased Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Purchased Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code. Section 365(f) of the Bankruptcy Code prohibits three distinct types of anti-assignment provisions that are not enforceable in the context of assignments effected under section 365 of the Bankruptcy Code: (a) provisions that "prohibit" the assignment of an executory contract or unexpired lease are unenforceable; (b) provisions that seek to "restrict" the ability of a debtor to assume and assign

16

an executory contract or unexpired lease are not given effect; and (c) provisions that "condition" the ability of a debtor to assume and assign an executory contract or unexpired lease are stricken. *See In re Boo.com North America, Inc.*, 2000 WL 1923949, *4 (Bankr. S.D.N.Y. 2000) (section 365(f)(1) prohibits enforcement of a subleasing profit provision because it might limit the debtor's ability to realize the full economic value of the lease, thereby hindering the debtor's reorganization efforts); *In re Jamesway Corp.*, 201 B.R. 73, 78 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) of the Bankruptcy Code prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect); *In re UL. Radio Corp.*, 19 B.R. 537, 543-44 (Bankr. S.D.N.Y. 1982) (lease assignment to commercial restaurant would not violate clause that requires use as a television sales and service store). Parties affected by the assignment of the Purchased Contracts who seek to restrict a debtor's assignment rights by preserving in their underlying contracts or leases such anti-assignment provisions, run counter to the plain language of section 365(f) of the Bankruptcy Code, and such provisions should not be enforced.

37. In this case, the proposed facts before the Court, satisfy all of the requirements for the assumption and assignment of the Purchased Contracts pursuant to section 365 of the Bankruptcy Code. To the extent that any defaults exist under any of the Purchased Contracts, the defaults will be cured by the Purchaser pursuant to the Assumption and Assignment Procedures as set forth in the APA. Moreover, the Purchaser possesses the requisite financial wherewithal, experience in the industry and willingness and ability to perform under the Purchased Contracts. Accordingly, the Debtors submit that the assumption and assignment of the Purchased Contracts, pursuant to the terms of the APA, should be approved.

F.  **Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.**

38. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtors request that any order approving the Proposed Sale and the assumption and assignment of the Purchased Contracts be effective immediately by providing that the 10-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

39. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(g) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, Collier suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier provides that if an objection is filed and overruled and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

40. As set forth in greater detail above, time is of the essence with respect to the Proposed Sale. To preserve the value of the Assets of the JDM business and to meet the timing requirements under the DIP Facility and potential confirmation of the plan of liquidation proposed by the Debtors, it is critical that the Debtors close the sale as soon as possible after all closing conditions have been met or waived. In addition, due to the overhang of the chapter 11

cases and the announcement of the wind down of operations of the JDM business, the customer base is diminishing each day. Thus, the going concern value of the JDM business is diminishing. Accordingly, the Debtors hereby requests that the Court waive the 10-day stay period under Bankruptcy Rules 6004(h) and 6006(d) with respect to the Sale Order, so that it can be effective upon its entry without further costly delay.

## Notice

41.  Notice of this Motion has been given to: (i) the United States Trustee; (ii) counsel to the unsecured creditors' committee in these cases (the "Committee"); (iii) counsel to National City Business Credit, Inc.; (iv) counsel to Roynat Business Capital, Inc.; (v) counsel to the Purchaser; (vi) all parties known or reasonably believed to have asserted a lien on any of the Assets; (vii) the counterparties to each of the Assigned Contracts; (viii) all persons or entities known or reasonably believed to have expressed an interest in acquiring the Assets; (ix) all taxing authorities having jurisdiction over any of the Assets; (x) the Attorneys General in the States where the Assets are located; (xi) the United States Environmental Protection Agency and comparable State agencies where the Assets are located; (xii) J&D's thirty largest creditors; and (xiii) all parties that have requested personal notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: Wilmington, Delaware
July 2, 2009

YOUNG CONAWAY STARGATT & TAYLOR, LLP-

_____
M. Blake Cleary (No. 3614)
Edward J. Kosmowski (No. 3849)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

WINSTON & STRAWN LLP
Daniel J. McGuire (IL #06239526)
Myja K. Kjaer (IL #06289949)
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

Counsel for Debtors